**UNITED STATES of America**

v.

**Gary Lee SAMPSON**

**No. CR. 01–10384–MLW.**

United States District Court,
D. Massachusetts.

Aug. 11, 2003.

---

**14.** *Id.*

**15.** Compl. at 1.

Emily R. Schulman, Frank M. Gaziano, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Robert L. Sheketoff, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. BACKGROUND AND SUMMARY

Defendant Gary Lee Sampson is charged with two counts of carjacking resulting in death in violation of 18 U.S.C. § 2119(3). The Attorney General has filed a notice of his intention to seek the death penalty.

Sampson has moved to dismiss the death penalty charges against him and also challenges the government's right to present certain evidence in support of them. Although Sampson raises at least one serious issue, each of his thirteen claims is either without merit or not ripe for resolution. Therefore, his motions to dismiss the death penalty charges and for certain other relief are being denied.

The fundamental facts of this case are not in dispute. On July 23, 2001, Sampson, a 41–year old white male who was wanted for committing a series of bank robberies in North Carolina, called the Boston Office of the Federal Bureau of Investigation (the "FBI") to ask that the FBI arrest him. The call was received by William Anderson, an FBI employee. Although Sampson reportedly waited in Abington, Massachusetts for the FBI to arrive, he was not arrested. Anderson had disconnected Sampson's call and did not report it to anyone.

On July 24, 2001, Phillip McCloskey, a 69–year old white retiree, picked up Sampson, who was hitchhiking. Sampson subsequently murdered McCloskey and attempted to steal his car.

On July 27, 2001, Sampson was hitchhiking again. He was picked up by Jonathan Rizzo, a white college student. Sampson murdered Rizzo and stole his automobile.

On July 30, 2001, Sampson encountered Robert Whitney in New Hampshire. Sampson murdered Whitney and took his automobile.

On July 31, 2001, William Gregory picked up Sampson who was hitchhiking in Vermont. Sampson pulled a knife and ordered Gregory to drive down a dirt road. Gregory, however, jumped out of his automobile, which Sampson drove away. Gregory reported that his car had been stolen. Shortly thereafter, Sampson called 911 to surrender.

Sampson was arrested by the Vermont State Police and quickly confessed his crimes, including the murders of McCloskey, Rizzo, and Whitney. He also said that he had sought to surrender to the FBI before committing those murders.

In August 2001, Sampson was charged by the Commonwealth of Massachusetts for the murders of McCloskey and Rizzo. In 1972, the United States Supreme Court declared the nation's death penalty statutes unconstitutional because, as they were written and operated, they resulted in the arbitrary and capricious imposition of the ultimate sanction. *See Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). By 1976, Georgia had enacted a new statute, which limited and directed the exercise of a jury's discretion to decide whether to sentence a defendant to death, that was found to be constitutional. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Today, thirty-eight states have laws providing for the death penalty. However, Massachusetts has since 1972 repeatedly declined to enact legislation that would reinstitute death as a penalty for murder or any other crime. Sampson was willing to plead guilty to the murder charges against him and to accept the maximum sentence permitted under Massachusetts law—life in prison without parole.

However, on October 24, 2001, Sampson was also indicted in this federal case, which could result in his execution under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591, *et seq.* (the "FDPA"). Following the *Furman* decision in 1972, there was not a constitutionally valid federal death penalty statute. In 1988, the federal death penalty was instituted for certain drug offenses. *See* 21 U.S.C. § 848(e). In 1994, the FDPA extended the federal death penalty to more than fifty additional crimes, including carjacking resulting in death, but not to murder, which is not alone a federal offense. While murder is, of course, a horrible crime, it has not historically been a federal crime. Prior to the FDPA, if Sampson had murdered McCloskey and Rizzo in Massachusetts, he would not have been subject to the death penalty. He now faces the possibility of execution because he also stole, or attempted to steal, their automobiles.[1]

The Massachusetts charges against Sampson were dismissed in deference to this federal prosecution. Sampson offered to plead guilty and accept a federal sentence of life in prison without the possibility of parole. The Department of Justice did not accept this offer. Rather, on November 19, 2002, the Attorney General filed a notice of intent to seek the death penalty in this case.

---

1. Sampson is not in this case charged with any crime committed in New Hampshire that involved the Whitney murder because there is not venue for any such offense in the District of Massachusetts. If Sampson pleads or is found guilty of either charge in this case, the jury will be permitted to consider the murder of Whitney in deciding whether Sampson should be executed for the crimes he committed in Massachusetts.

The court has previously rejected both Sampson's claim that the Supreme Court's 2002 decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), renders the FDPA unconstitutional, and his related claim that he has a right to plead guilty and be sentenced to life in prison without parole. *See United States v. Sampson*, 245 F.Supp.2d 327 (D.Mass. 2003). Sampson subsequently filed a motion to dismiss the death penalty charges against him, alleging that the FDPA violates the Eighth Amendment, which prohibits cruel and unusual punishment, for a series of related reasons. He also attacks some of the factors and evidence on which the government intends to rely in its effort to persuade the jury that Sampson should be executed. *See* § III, *infra*. Some, but not all, of Sampson's claims are now ripe for resolution. *See* § V, *infra*.

The court has received voluminous briefs from the parties. A hearing on the pending motions was held on June 11 and 16, 2003. For the reasons described in detail in this Memorandum, the court is now deciding Sampson's primary claims as follows.

Only the Supreme Court can reverse its prior decisions that the death penalty is not inherently cruel and unusual punishment. *See* § VI, *infra*. Sampson has not proven his claim that the FDPA results in death sentences that are arbitrary and capricious because of alleged regional and racial disparities. *See* § VIII, *infra*.[2] Sampson's claims that the FDPA is unconstitutional because it does not mandate the use of the Federal Rules of Evidence at the sentencing phase of a capital case and does not provide for adequate appellate review are not ripe for resolution. *See* §§ IX, XI, *infra*. Sampson is not correct in his contentions that the FDPA does not authorize a sentencing jury to consider unadjudicated criminal conduct and that doing so would constitute an impermissible delegation of legislative power to the executive branch. *See* §§ XII.C, XII.B, *infra*.

Sampson's motion to dismiss does present a serious question concerning whether the FDPA is unconstitutional because of the mounting evidence that innocent individuals have been sentenced to death, and undoubtedly executed, more often than previously understood. *See* § VII, *infra*. However, the court finds that Sampson has not demonstrated that the FDPA is now unconstitutional for this reason.

As the Supreme Court has repeatedly reiterated, whether a penalty constitutes cruel and unusual punishment is not determined by the standards of the eighteenth century when the Eighth Amendment was adopted. Rather, the Eighth Amendment must draw its meaning from "'the evolving standards of decency that mark the progress of a maturing society.'" *Atkins v. Virginia*, 536 U.S. 304, 311–12, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). It is, therefore, the duty of the courts to reconsider periodically whether the death penalty offends

---

**2.** As described in § VIII, *infra*, the traditional regional disparities in seeking the federal death penalty may reasonably, rather than irrationally, reflect, in part, deeply-held differences of opinion concerning the propriety of the ultimate sanction in different states and regions. Until June 2001, the Department of Justice's stated policies respected those differences and did not permit the fact that a state's law did not provide for the death penalty to alone create the substantial interest in federal prosecution necessary to prompt the initiation of a federal capital case. In June 2001, the Department of Justice's policies concerning capital cases were amended. It appears that the fact that a state's laws do not authorize capital punishment may now alone be deemed sufficient to justify a federal death penalty prosecution.

contemporary standards of decency. *See* § IV, *infra.*

In doing so, a court must focus on objective indicia of contemporary attitudes to the maximum extent possible. *Atkins,* 536 U.S. at 311, 122 S.Ct. 2242. Legislation, enacted by elected representatives, is a primary form of such objective evidence. However, the fact that a statute, or many statutes, authorize the death penalty is not the end of the inquiry. As the Supreme Court has written:

> "Judicial review by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to [the courts] in no different posture.... [T]he Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and [ ] there are punishments that the Amendment would bar whether legislatively approved or not."

*Gregg,* 428 U.S. at 174, 96 S.Ct. 2909 (quoting *Furman,* 408 U.S. at 313–14, 92 S.Ct. 2726 (White, J., concurring)).

Jury verdicts are also significant and reliable evidence of contemporary values. Indeed, "one of the most important functions any jury can perform in making ... a selection [between life and death] is to maintain a link between community values and the penal system—a link without which the determination of punishment would hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (quoting *Trop,* 356 U.S. at 101, 78 S.Ct. 590 (plurality opinion)).

In deciding the current meaning of the Eighth Amendment, the Supreme Court has also recently considered polling data, and the practices of England and other Western European countries that share our nation's traditions. This court has considered all of these objective factors in the instant case, giving the greatest weight to legislation and jury verdicts.

■ Contrary to the government's contention, and the decision of the Second Circuit in *United States v. Quinones,* 313 F.3d 49 (2d Cir.2002), *reh'g denied,* 317 F.3d 86 (2d Cir.2003), the Supreme Court has never decided whether the risk of executing innocent individuals renders the death penalty unconstitutional. *See* § VII, *infra.* Although Sampson does not claim to be innocent, he does have standing to assert that the FDPA is unconstitutional for this reason.[3] Whether he has a right not to be executed pursuant to an unconstitutional statute is a question that implicates a debate that is raging among Justices of the Supreme Court and in academia. This question need not be resolved in this case because Sampson has not proven that the FDPA is unconstitutional as a result of the risk of executing innocent individuals. He has, however, persuaded the court that this is a serious question, that future developments could strengthen this argument, and that courts will have a duty to monitor carefully future legislation and jury verdicts concerning the death penalty in deciding what is likely to be the constantly recurring question of whether the risk of executing innocent individuals renders the death penalty generally, or the FDPA particularly, unconstitutional. *See* § VII, *infra.*

---

**3.** Because he has acknowledged that he murdered McCloskey and Rizzo (and Whitney as well), Sampson is not a sympathetic proponent of the proposition that the FDPA will result in the execution of innocent individu-als. However, the court must decide issues properly presented and ripe for resolution based on neutral principles, without regard to Sampson's particular circumstances.

More specifically, in 1993, a majority of the Justices of the Supreme Court stated that the execution of an innocent person would violate the Constitution. *See Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). This court agrees.

The risk of executing the innocent has long been recognized. However, in the past decade substantial evidence has emerged to demonstrate that innocent individuals are sentenced to death, and undoubtedly executed, much more often than previously understood. In that period, DNA testing has established the actual innocence of at least a dozen inmates who had been sentenced to death. These developments have prompted the reinvestigation of many other capital cases, resulting in the release of more than 100 innocent individuals from the nation's death rows.

In deciding in 2002 that it is no longer constitutional to execute the mentally retarded, the Supreme Court wrote that "we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated." *Atkins*, 536 U.S. at 320 n. 25, 122 S.Ct. 2242. The government correctly asserts that the Supreme Court was addressing convictions obtained in state courts, rather than under the FDPA. The government contends that similar errors could not occur in federal courts.

The government's confidence that the FDPA will never lead to the execution of innocent individuals is not shared by the only federal judge to have conducted the trial of an FDPA case in Massachusetts. Judge Michael Ponsor presided in the trial of Kristen Gilbert, a nurse convicted of murdering four of her patients and at-

tempting to murder three others. After the jury's 2001 verdict decided that she should be sentenced to life in prison, Judge Ponsor wrote that "[t]he experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably execute innocent people—not too often, one hopes, but undoubtedly sometimes." Appendix ("A–")–90, Michael Ponsor, "Life, Death, and Uncertainty," *Boston Globe*, July 8, 2001, at D2.

There are compelling reasons to believe that Judge Ponsor's prediction is prophetic. Federal judges, like state judges, are human and, therefore, fallible. Jurors in federal cases are essentially the same citizens who serve as jurors in state cases. In addition, many federal cases, including this one, result from investigations conducted primarily, if not exclusively, by state and local law enforcement.

The instant case illustrates the potential for serious imperfections in a federal capital case. Since Sampson surrendered, his counsel has proclaimed that he would rely heavily on Sampson's telephone call to the FBI as a mitigating factor in the effort to persuade a jury not to sentence Sampson to death. Anderson, among others, was promptly questioned by the FBI and later by the Department of Justice Inspector General concerning Sampson's claim that he had called the FBI. Anderson repeatedly denied receiving the call, including in a sworn interview and affidavit given on October 30, 2001. In December 2001, Anderson acknowledged that he received Sampson's call after being informed that he had failed a polygraph examination concerning it. If Anderson's perjury had not been discovered, a jury in this case would have been deprived of evidence that might determine whether Sampson lives or dies.[4]

---

4. Anderson was prosecuted for making false statements to federal officials, but not for perjury. The government initially represented that Anderson had not been sworn before being interviewed in October 2001. After the

court pointed out that the interview report stated that Anderson had been administered an oath, the government acknowledged that its assertion that Anderson had not been

Important errors are, however, not always identified prior to death sentences being imposed, at times because of misconduct by state and federal investigators. It is now clear that in 1967 Joseph Salvati and several other individuals were unfairly convicted because the FBI had withheld information that its informants, rather than the defendants, had murdered Edward Deegan, and had allowed its informants to testify falsely against the innocent men. Several of the defendants, including Peter Limone, were sentenced to death. While those death sentences were reduced to life in prison following the invalidation of the death penalty by *Furman,* two of the wrongfully convicted men died in prison. Salvati, who was originally sentenced to life in prison, received a commutation and was released in 1997. Limone was released in 2001, after his wrongful conviction had been demonstrated. *See United States v. Flemmi,* 195 F.Supp.2d 243, 251 (D.Mass.2001).

The deliberate misconduct by federal investigators that was so belatedly revealed with regard to the Deegan murder is neither ancient history nor unique to Boston. Daniel Bright was, in 1996, convicted of murder by the state of Louisiana and sentenced to death. Several months ago, a federal judge found that the FBI had evidence that another person had claimed to have committed the murder, but the FBI violated the government's constitutional duty to disclose that evidence to Bright before his trial, and later lied to the federal judge about its existence. *See Bright v. Ashcroft,* 259 F.Supp.2d 494 (E.D.La.2003) and 259 F.Supp.2d 502 (E.D.La.2003).

The government misconduct concerning Salvati and Bright are not isolated occurrences. A recent study of capital cases from 1973 to 1995 reported that one of the two most common errors prompting the reversal of state convictions in which the defendant was sentenced to death was the improper failure of police or prosecutors to disclose "important evidence that the defendant was innocent or did not deserve to die." James S. Liebman, *et al., A Broken System: Error Rates in Capital Cases, 1973–1995* at ii (2000). As indicated earlier, the performance of state and local police is important to the operation of the FDPA because many cases, including this one, have initially been investigated by them and later brought in federal court, at times in an effort to achieve a death sentence that is not available under state law.

Serious errors appear to be common in capital cases. After analyzing more than 4500 appeals of capital cases, the same study found that "the overall rate of prejudicial error in the American capital punishment system was *68%. " Id.* at i (emphasis in original). As the authors later wrote:

> For cases whose outcomes are known, an astonishing 82% of retried death row inmates turned out not to deserve the death penalty; 7% were not guilty. The process took nine years on average. Put simply, most death verdicts are too flawed to carry out, and most flawed ones are scrapped for good. One in 20 death row inmates is later found not guilty.

A–284, James Liebman, *et al.,* "Technical Errors Can Kill," *Nat'l L.J.,* Sept. 4, 2000, at A16.

In view of the foregoing, this court agrees with Judge Ponsor, among others, that the FDPA, like the state death penalty statutes, will inevitably result in the

sworn was incorrect. Although the government recommended a probationary sentence, this court sentenced Anderson to prison, in part because his perjury had the potential to deprive a jury of information that may be material to whether Sampson will be executed. *See United States v. Anderson,* 260 F.Supp.2d 310, 315–16 (D.Mass.2003).

execution of innocent people. Since a majority of the Supreme Court stated in 1993 that the execution of an innocent person would be unconstitutional, the critical question is how many of those who will be executed must be innocent to offend contemporary standards of decency and, therefore, render the FDPA unconstitutional.

The government contends that where, as here, a defendant claims that a statute is unconstitutional on its face "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). However, "[t]o the extent [the Supreme Court has] consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of [the Supreme] Court, including *Salerno* itself . . . ." *City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion).

Nor does the quoted dicta from *Salerno* provide the proper test for deciding Sampson's Eighth Amendment claim that the risk of executing the innocent renders the FDPA unconstitutional. That standard would require that the statute be upheld unless it would be unconstitutional as applied to everyone. Thus, under the *Salerno* dicta the FDPA would be constitutional if 99 times out of 100 it resulted in the execution of an innocent individual because there would be one case in which a guilty person would be executed. However, a statute that resulted in the execution of actually innocent individuals in 99% of all cases undoubtedly would be deemed to impose cruel and unusual punishment.

The Supreme Court has held that a statute regulating abortion was subject to a facial challenge and unconstitutional if "in a large fraction of the cases in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Planned Parenthood v. Casey,* 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In *Casey,* the statutory requirement that a husband be notified before his wife had an abortion actually impacted about 1% of the women who seek abortions. *Id.* at 894–95, 112 S.Ct. 2791. Nevertheless, the requirement was declared unconstitutional on its face. *Id.* at 898, 112 S.Ct. 2791.

Similarly, in the instant case the proper question for the purpose of Eighth Amendment analysis is, as indicated earlier, how large a fraction of FDPA prosecutions must result in the execution of innocent individuals for the statute to offend contemporary standards of decency and, therefore, violate the Eighth Amendment. Answering this question implicates fundamental principles concerning the relative roles in our democracy of citizens, the representatives they elect to make laws, the officials responsible for executing them, and the courts.

As described earlier, courts are required to discern contemporary standards of decency from objective factors to the maximum possible extent. Those factors demonstrate the following. In 1791, the concept of "cruel and unusual punishment" incorporated in the Eighth Amendment was imported from English law. England and other nations that share our heritage have now abolished capital punishment.

Recent opinion polls show that 73% of Americans believe that our nation's death penalty statutes have resulted in the execution of an innocent person in the past five years. Nevertheless, 74% say they support the death penalty. However, only a slight majority (53%) prefer it to life in prison without parole (44%) for convicted murderers.

The decisions of juries in recent FDPA cases indicate that there is a definite dis-

parity between the attitudes of Americans toward the death penalty in general and their willingness to impose it in particular cases. In sixteen of the last seventeen penalty phase verdicts returned by juries in FDPA cases the defendant was not sentenced to death. In fifteen of those sixteen cases the defendant had been convicted of a federal crime involving murder. Therefore, juries have recently been regularly disagreeing with the Attorney General's contention that the death penalty is justified in the most egregious federal cases involving murder.

The difficulty that citizens as jurors have had in imposing the death penalty in federal cases has not, however, been manifested in legislative reform. After determining that seventeen people who had been sentenced to death in Illinois were actually innocent, in January 2003 the Governor of Illinois commuted the sentences of everyone left on that state's death row to life in prison. However, thirty-eight states and the federal government still have statutes providing for the death penalty. Neither the federal government nor any state has recently repealed a death penalty statute. Perhaps this is because of what the Supreme Court has characterized as "the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime." *Atkins*, 536 U.S. at 315, 122 S.Ct. 2242. Perhaps it is because citizens as voters are not wrestling with the risk of executing the innocent, or indeed the implications of executing the guilty, as citizens as jurors must.

In any event, the Supreme Court has explained that legislation is "the clearest and most reliable objective evidence of contemporary values." *Id.* at 312, 122 S.Ct. 2242. When the Supreme Court decided in 2002 that it is no longer permissible to execute the retarded, it relied largely on the facts that after the Court had

found the practice constitutional in 1988: many states enacted legislation exempting the retarded from execution; the direction of change was consistent; even states that continued to have statutes which authorized the execution of the retarded were not doing so; and only five retarded individuals had been executed in the past thirteen years. *See Atkins, supra.*

In *Atkins* the Supreme Court essentially held that because Virginia diverged from the substantial consensus that had emerged in legislation, decisions of prosecutors, and jury verdicts in many other states, it was arbitrary and capricious and, therefore, cruel and unusual for a retarded person in Virginia to face execution when a similarly situated individual in another jurisdiction would not. If the evolution of events concerning the general imposition of the death penalty parallels the developments described in *Atkins* concerning the execution of the retarded, the day may come when courts properly can and should declare the ultimate sanction to be unconstitutional in all cases.

However, that day has not come yet. There is not now sufficient objective evidence to establish that the death penalty offends contemporary standards of decency to permit a court to end political debate and democratic decisionmaking concerning its propriety.

Nevertheless, "the Clause forbidding 'cruel and unusual' punishments ... 'may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg*, 428 U.S. at 171, 96 S.Ct. 2909 (quoting *Weems v. United States*, 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). Judges seek to administer humane justice. Judicial decisions are part of a colloquy with citizens and those they elect to make and execute our laws. Those decisions have the potential to influence contemporary standards of decency and, therefore, the

current meaning of the Eighth Amendment.

While this court does not find that the risk of executing the innocent now renders the FDPA unconstitutional, the record regarding this issue raises profound questions. Those questions are not hypothetical. Rather, as demonstrated by the experiences of Salvati and Bright, among others, those questions are real and recurring.

Error is, of course, possible in any criminal case. While our system promises everyone a fair trial, it does not pretend to perform perfectly. However, as the Supreme Court has repeatedly reiterated, "[t]he penalty of death differs from all other forms of criminal punishment not in degree but in kind. It is unique in its total irrevocability." *Furman*, 408 U.S. at 306, 92 S.Ct. 2726 (Stewart, J., concurring);[5] *see also Ring*, 536 U.S. at 605–06, 122 S.Ct. 2428; *Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (Stevens, J.) (plurality opinion). Among other things, an execution eliminates the opportunity to end any injustice, even belatedly. Thus, this court will strive to provide the government and Sampson as fair a trial as possible.

In a capital case, however, our nation ultimately expresses its faith in democracy by relying on jurors, who represent the community, to decide the most just sentence. There has been only one FDPA case in which the federal death penalty has been imposed in a state—Michigan—that does not itself have the death penalty. Sampson's trial will determine whether this case will be the second.

## II. THE FEDERAL DEATH PENALTY ACT

The pending motions challenge the constitutionality of the FDPA and, if it is lawful, the admissibility of certain evidence under it. The FDPA was enacted in 1994 as an effort to establish a constitutional death penalty for more than fifty federal crimes, including the carjacking charges in this case.

In order to invoke the FDPA, the government must give the defendant notice of its intent to seek the death penalty. *See* 18 U.S.C. § 3593(a). The ultimate decision whether to seek the death penalty is not vested in the various United States Attorneys. Rather, the Attorney General of the United States decides whether to seek the death penalty in every case in which a defendant is charged with a federal crime for which death is a possible punishment. The Department of Justice has described the process as follows:

> On January 27, 1995, the Department adopted the policy still in effect today—commonly known as the death penalty "protocol"—under which United States Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offense, regardless whether the United States Attorney actually desires to seek the death penalty in that case. The United States Attorneys' submissions are initially considered by a committee of senior Department attorneys in Washington, D.C. known as the Attorney General's Review Committee on Capital Cases (Review Committee), which makes an independent recommendation to the Attorney General.

---

**5.** Justice Stewart also wrote that the death penalty: "is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman*, 408 U.S. at 306, 92 S.Ct. 2726 (Stewart, J., concurring).

U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988–2000)* 5 (2000) (the *"DOJ Study"*);[6] *see also* United States Attorneys' Manual ("USAM"), Capital Crimes § 9–10.000.

If the government decides to seek the death penalty, the FDPA bifurcates the trial into two phases, a guilt phase and a penalty phase. The penalty phase occurs only if the defendant is found guilty of a capital offense. In the context of this case, the government must prove during the guilt phase, beyond a reasonable doubt, that the defendant committed at least one carjacking or attempted carjacking resulting in death within the meaning of 18 U.S.C. § 2119(3). If the government proves either of the two capital charges, a penalty phase of the jury trial will be required.

There are two distinct issues before the jury during the penalty phase. The first is whether the defendant is eligible for the death penalty. If so, the second is whether the death penalty is justified.

In order to establish eligibility for a death sentence for a homicide, the government must prove, beyond a reasonable doubt, that: the defendant was at least 18 years old at the time of the offense, 18 U.S.C. § 3591(a); he acted with one of the four mental states set forth in 18 U.S.C. § 3591(a)(2); and at least one of the sixteen statutory aggravating factors set forth in 18 U.S.C. § 3592(c) exists. If the government fails to establish eligibility, a death sentence cannot be imposed.

If the jury finds that the defendant is eligible for the death penalty, it must decide whether a sentence of death is justified. In reaching this decision, the jury must weigh any aggravating factors against any mitigating factors. In order to recommend that the defendant be sentenced to death, the jury must unanimously conclude that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, [ ] the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). The jury can also recommend a sentence of life imprisonment or, in some cases, some lesser punishment. A jury's "recommendation" of a sentence of death or life imprisonment is binding on the court. 18 U.S.C. § 3594.

Aggravating factors may include statutory aggravating factors and non-statutory aggravating factors identified by the government in its notice of intent to seek the death penalty. *See* 18 U.S.C. § 3593; § XII.A, *infra.* Mitigating factors may include any "relevant circumstance that could cause [a jury] to decline to impose the [death] penalty." *McCleskey v. Kemp,* 481 U.S. 279, 305–06, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Different standards govern the proof of aggravating factors and mitigating factors. "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information." 18 U.S.C. § 3593(c). A jury must unanimously agree that an aggravating factor has been proven in order to consider it in deciding if the death penalty is justified. 18 U.S.C. § 3593(d). However, any juror who finds that the

---

**6.** This study was submitted by the defendant as a "special appendix" in support of his pre-

trial motions.

defendant has established a mitigating factor may take it into account in considering whether a death sentence is justified even if no other juror finds that that mitigating factor has been proven. *Id.*

The FDPA refers to "information" rather than "evidence" because the penalty phase of a capital case is not governed by the Federal Rules of Evidence. *See* 18 U.S.C. § 3593(c). Rather, any relevant information may be presented to the jury unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.*

In order to guard against discrimination, the jurors are given special instructions prohibiting them from considering "the race, color, religious beliefs, national origin, or sex of the defendant or of any victim," and admonishing the jury "not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." 18 U.S.C. § 3593(f). Each juror is required to certify that he or she has followed these special instructions. *Id.*

The FDPA also includes special provisions for appellate review if the defendant is sentenced to death. *See* 18 U.S.C. § 3595.

## III. SAMPSON'S CLAIMS

Sampson's pretrial motions present thirteen claims. First, Sampson raises a series of challenges to the FDPA, some of which would apply to any FDPA prosecution. Specifically, he contends that the FDPA is unconstitutional because: it is inherently cruel and unusual punishment (Point Thirteen); it will inevitably result in the execution of innocent individuals (Point Four); it is arbitrary and capricious because it is so rarely sought or imposed

(Point One), there is no principled basis for distinguishing the cases in which it is imposed from those in which it is not (Point Two), and it is sought and imposed on the invidious basis of race and the irrational basis of geography (Point Three); the penalty phase is not governed by the Federal Rules of Evidence (Point Five); it does not require that a grand jury allege the facts that would subject a defendant to the death penalty (Point Six); and it fails to provide for meaningful appellate review (Point Twelve), particularly for proportionality review (Point Eleven).

Sampson also makes a series of claims that are specific to this case. He contends that the FDPA either does not authorize the consideration of the non-statutory aggravating factors that have been alleged (Point Seven) or, if it does, the FDPA involves an unconstitutional delegation of legislative power to the executive branch (Point Ten). Sampson also asserts that some of the non-statutory factors alleged in this case are irrelevant, duplicative, or unsupported by the facts (Point Eight). Among other things, he argues that unadjudicated alleged criminal conduct may not be considered by the jury (Point Nine).

As described below, Sampson's claim that the FDPA is unconstitutional must be analyzed under the Eighth Amendment. His statutory claims require interpretation of the FDPA.

## IV. THE GENERALLY APPLICABLE CONSTITUTIONAL LAW

As indicated earlier, Sampson asserts that the FDPA is unlawful because it violates the Eighth Amendment for a variety of reasons.

The Eighth Amendment, in pertinent part, prohibits the infliction of "cruel and unusual punishments." U.S. Const., Am. VIII. "[T]he primary concern of the drafters was to proscribe 'torture(s)' and other

'barbar(ous)' methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Anthony F. Granucci, "Nor Cruel and Unusual Punishment Inflicted: The Original Meaning," 57 *Cal. L.Rev.* 839, 842 (1969)). However, the Supreme "Court has not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner." *Gregg*, 428 U.S. at 171, 96 S.Ct. 2909. Because " '[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man .... [t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Atkins*, 536 U.S. at 311–12, 122 S.Ct. 2242 (quoting *Trop*, 356 U.S. at 100–01, 78 S.Ct. 590 (plurality opinion)).

Therefore, a claim that a punishment is cruel and unusual "is judged not by the standards that prevailed ... when the Bill of Rights was adopted [in 1791], but rather by those that currently prevail." *Atkins*, 536 U.S. at 311, 122 S.Ct. 2242. As the Supreme Court has often reiterated, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.' " *Gregg*, 428 U.S. at 171, 96 S.Ct. 2909 (quoting *Weems*, 217 U.S. at 378, 30 S.Ct. 544); *accord Thompson v. Oklahoma*, 487 U.S. 815, 821 n. 4, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *McCleskey*, 481 U.S. at 300, 107 S.Ct. 1756; *Sellars v. Beto*, 409 U.S. 968, 970, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972).

█ Sampson also contends that the FDPA violates his Fifth Amendment right to substantive due process. Government conduct violates a right to substantive due process if it shocks the conscience. *See, e.g., Rochin v. California*, 342 U.S. 165,

172–74, 72 S.Ct. 205, 96 L.Ed. 183 (1952). A right to substantive due process is also violated by conduct that is offensive to a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (quoting *Patterson v. New York*, 432 U.S. 197, 201–02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).

However, the Supreme Court has held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of governmental behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In the instant case, the Eighth Amendment provides such an "explicit textual source of constitutional protection." *Id.*

Nevertheless, the Supreme Court has occasionally referred to the substantive due process standard, in addition to the Eighth Amendment standard, in addressing issues concerning the death penalty. *See, e.g., Herrera*, 506 U.S. at 419, 113 S.Ct. 853 (O'Connor, J. and Kennedy, J., concurring), 435–37 (Blackmun, J., Stevens, J., and Souter, J., dissenting). However, the Supreme Court essentially treats the Eighth Amendment and substantive due process standards as interchangeable. *Id.* As Justice Marshall wrote in *Furman*, 408 U.S. at 359 n. 141, 92 S.Ct. 2726, "[t]he concepts of cruel and unusual punishment and substantive due process become so close as to merge ..." (Marshall, J., concurring); *see also Quinones*, 313 F.3d at 70 n. 18 (2d Cir.2002).

At oral argument, Sampson's counsel could not identify any material difference

between the standard for determining a violation of a Fifth Amendment right to substantive due process and the standard for deciding whether a violation of the Eighth Amendment has occurred. *See* June 11, 2003 Tr. at 29. Nor can the court. Thus, the court is in this Memorandum addressing Sampson's Eighth Amendment claims, but not separately analyzing his Fifth Amendment substantive due process claims.[7]

As described earlier, the court must judge Sampson's claims that the FDPA violates the right to be free from cruel and unusual punishment by the standards of decency that "currently prevail." *Atkins,* 536 U.S. at 311, 122 S.Ct. 2242. Doing so implicates fundamental issues concerning the relative roles in our democracy of citizens, the representatives they elect to make laws, the officials responsible for executing those laws, and the courts.

"[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Gregg,* 428 U.S. at 175–76, 96 S.Ct. 2909 (quoting *Furman,* 408 U.S. at 383, 92 S.Ct. 2726 (Burger, C.J., dissenting)). However, the fact that a federal statute authorizes the imposition of the death penalty is not the end of the inquiry. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Therefore:

"[j]udicial review by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to [the courts] in no different posture.... [T]he Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and [ ] there are punishments that the Amendment would bar whether legislatively approved or not."

*Gregg,* 428 U.S. at 174, 96 S.Ct. 2909 (quoting *Furman,* 408 U.S. at 313–14, 92 S.Ct. 2726 (White, J., concurring)). Thus, " 'the Constitution contemplates that in the end [the court's] own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " *Atkins,* 536 U.S. at 312, 122 S.Ct. 2242 (quoting *Coker v. Georgia,* 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)).

The Supreme Court's decision in *Atkins* illustrates and illuminates these issues. In 1989, the Supreme Court held in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that executing a mentally retarded individual did not violate the Eighth Amendment. In 2002, the Supreme Court reversed *Penry* because it found that "[m]uch ha[d] changed since" 1989. *Atkins,* 536 U.S. at 314, 122 S.Ct. 2242.

In reaching this decision, the Supreme Court stated that "evolving standards of decency" must be ascertained from " 'objective factors to the maximum possible extent.' " *Id.* at 312, 122 S.Ct. 2242 (quoting *Harmelin,* 501 U.S. at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274–75, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (quoting *Coker,* 433 U.S. at 592, 97 S.Ct. 2861))). The " 'clearest and most reliable objective evidence of contemporary values is legislation enacted by the country's legislatures.' " *Id.* (quoting *Penry,* 492 U.S. at 331, 109 S.Ct. 2934). In

---

7. Sampson does have a Fifth Amendment right to *procedural* due process which is independent of his Eighth Amendment rights. Sampson's procedural due process claims are being addressed separately in this Memorandum.

reversing *Penry,* the Court relied, in part, on the "consistency of the direction of [the] change" in the sixteen states that had since 1989 enacted statutes prohibiting the execution of retarded individuals. *Id.* at 314–16, 109 S.Ct. 2934. The Court also noted that while "[s]ome States, for example New Hampshire and New Jersey, continue to authorize executions ... none ha[d] been carried out in decades" and, therefore, "there [was] little need to pursue legislation barring the execution of the mentally retarded in those States." *Id.* at 316, 109 S.Ct. 2934.

In addition, both the majority and the dissent in *Atkins* gave weight to the decisions of citizens acting as jurors. The majority observed that "even among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since" *Penry* was decided thirteen years before. *Id.* at 316, 109 S.Ct. 2934. In his dissent, Chief Justice Rehnquist wrote that "[o]ur opinions have ... recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments 'is a significant and reliable objective index of contemporary values.'" 536 U.S. at 323, 122 S.Ct. 2242 (Rehnquist, C.J., dissenting) (quoting *Coker,* 433 U.S. at 596, 97 S.Ct. 2861 and *Gregg,* 428 U.S. at 181, 96 S.Ct. 2909). Thus, the Supreme Court has again recently recognized and reaffirmed that "one of the most important functions any jury can perform in making ... a selection [between life and death] is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment would hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Witherspoon,* 391 U.S. at 519 n. 15, 88 S.Ct. 1770 (quoting *Trop,* 356 U.S. at 101, 78 S.Ct. 590 (plurality opinion)).

In finding that contemporary standards of decency deemed executing the retarded to be cruel and unusual, the Supreme Court in *Atkins* discussed polling data concerning United States citizens and also the fact that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved." *Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242; *see also Thompson,* 487 U.S. at 830–31 n. 31, 108 S.Ct. 2687 (practices of foreign countries, particularly Western European democracies, are relevant to determining standards of decency). Judicial consideration of attitudes in other countries has been criticized. *See Stanford v. Kentucky,* 492 U.S. 361, 369 n. 1, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) ("[P]ractices of other nations .... cannot serve to establish the first Eighth Amendment prerequisite, that the practice is accepted among our people."); *Atkins,* 536 U.S. at 347–48, 122 S.Ct. 2242 (Scalia, J., dissenting) ("Equally irrelevant [as polls] are the practices of the 'world community,' whose notions of justice are (thankfully) not always those of our people.").

However, as the Supreme Court discussed in both *Furman,* 408 U.S. at 242, 92 S.Ct. 2726 (Douglas, J., concurring) and *Gregg,* 428 U.S. at 169, 96 S.Ct. 2909, the phrase "cruel and unusual punishments" was taken from the English Bill of Rights of 1689. Thus, in *Gregg,* the Court understandably referenced the English experience, noting that "[t]he imposition of the death penalty for the crime of murder has a long history of acceptance both in the United States and in England." *Gregg,* 428 U.S. at 176, 96 S.Ct. 2909. Similarly, in deciding that laws prohibiting sodomy violate a person's right to substantive due process, the Supreme Court recently relied on the English experience and decisions of the European Court of Human Rights.

*See Lawrence v. Texas,* —— U.S. ——, ——, ——, 123 S.Ct. 2472, 2481, 2483, 156 L.Ed.2d 508 (2003).

 Therefore, the court is persuaded that it is appropriate to consider in this case polling data and the experience of other nations which share our traditions in determining contemporary standards of decency. While less meaningful than legislation or jury verdicts, they are factors that are relevant to determining whether a sufficient consensus has emerged to render a previously permissible punishment now cruel and unusual. *Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242.

In any event, while courts must look to objective evidence in deciding the "standards of decency" that have evolved and currently prevail, they may also, by their decisions, properly influence those standards. As described earlier, the Supreme Court has since 1910 regularly reiterated that the Eighth Amendment "may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems,* 217 U.S. at 378, 30 S.Ct. 544; *Thompson,* 487 U.S. at 821 n. 4, 108 S.Ct. 2687; *McCleskey,* 481 U.S. at 300, 107 S.Ct. 1756; *Gregg,* 428 U.S. at 171, 96 S.Ct. 2909; *Sellars,* 409 U.S. at 970, 93 S.Ct. 279. Judges strive to administer humane justice. Their decisions have the potential to educate citizens, and those who represent them in enacting and implementing statutes providing for punishment. As Judge Charles E. Wyzanski, Jr. wrote in 1959 to Senator Leverett Saltonstall, the District Judge particularly "is a teacher of parties, witnesses, . . . and even casual visitors to his court. His conduct of a [case] may fashion and sustain the moral principles of the community." Walter F. Murphy & C. Herman Pritchett, eds., *Courts, Judges & Politics: An Introduction to the Judicial Process* 108 (1986).

In essence, the late Alexander Bickel aptly described the judicial function with regard to the Eighth Amendment when he wrote:

> The [Supreme] Court is a leader of opinion, not a mere register of it, but it must lead opinion, not merely impose its own
> . . . .
>
> \* \* \* \* \* \*
>
> [T]he Court does not work in isolation to divine the answer that is right. It has the means to elicit partial answers and reactions from other institutions, and to try tentative answers itself. When at last the Court decides that "judgment cannot be escaped—the judgment of this Court," the answer is likely to be a proposition "to which widespread acceptance may fairly be attributed," because in the course of a continuing colloquy with the political institutions and with society at large, the Court has shaped and reduced the question, and perhaps because it has rendered the answer familiar if not obvious. . . . [I]n American society the colloquy goes well beyond the [legal] profession and reaches deeply into the places where public opinion is formed.

Alexander M. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* 239–40 (1962).

## V. SAMPSON HAS STANDING TO PRESENT HIS CHALLENGES TO THE FDPA, BUT ONLY SOME ARE RIPE TO BE RESOLVED NOW

Sampson asks the court to declare now, prior to trial, that the FDPA is unconstitutional on nine grounds. Although supported by voluminous appendices, Sampson characterizes his motion as a "facial challenge" to the statute.[8] Many courts

---

**8.** The government agreed that the court could consider the information in the appendices in

deciding Sampson's pretrial motions. It does

have addressed as facial challenges prior to trial the issues Sampson presents and have usually rejected them. *See, e.g., United States v. Llera Plaza*, 179 F.Supp.2d 444 (E.D.Pa.2001); *United States v. Minerd*, 176 F.Supp.2d 424 (W.D.Pa.2001); *United States v. Bin Laden*, 126 F.Supp.2d 290 (S.D.N.Y.2001) (citing cases); *United States v. Cooper*, 91 F.Supp.2d 90 (D.D.C.2000); *United States v. Frank*, 8 F.Supp.2d 253 (S.D.N.Y.1998); *United States v. Kaczynski*, CR–S–96–259, 1997 WL 716487 (E.D.Cal. Nov. 7, 1997); *United States v. Nguyen*, 928 F.Supp. 1525 (D.Kan.1996); *United States v. McVeigh*, 944 F.Supp. 1478 (D.Colo.1996). *But see United States v. Fell*, 217 F.Supp.2d 469 (D.Vt.2002), *appeal docketed*, No. 02–1638 (2d Cir.2002); *Quinones*, 205 F.Supp.2d 256 (S.D.N.Y.2002), *rev'd*, 313 F.3d 49 (2d Cir.2002), *reh'g denied*, 317 F.3d 86 (2d Cir.2003). However, the First Circuit has not decided any of the issues Sampson presents. Therefore, except for any issues decided by the Supreme Court, there is no precedent that this court must follow in deciding Sampson's many challenges to the FDPA.

In opposing Sampson's earlier motion seeking a declaration that the FDPA was unconstitutional on its face after the Supreme Court's decision in *Ring, supra*, the government argued that:

> To sustain such a challenge to a federal statute, the defendant has a supremely high hurdle:
>
>> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that

> [a federal statute] ... might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court has] not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.
>
> *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

Gov.'s Opp'n to Mot. to Enter a Guilty Plea to the Second Superseding Indictment at 5–6 (ellipsis and first bracketed text in original). The government argues that Sampson lacks standing to assert many of his claims, none of Sampson's current claims meets the *Salerno* standard, and, in any event, at least some of them are not now ripe for resolution.

Sampson responds that he "should not be required to stand trial for his life [based] on an unconstitutional statute." June 11, 2003 Tr. At 48. Sampson also contends that *Salerno* does not provide the proper test for deciding his challenges to the FDPA.

Sampson's position is essentially premised on the reasoning of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

> [T]he principle is a collateral consequence of *Marbury's* specific concept of the rule of law. Chief Justice Marshall's opinion in *Marbury* frames the ultimate question as follows: "If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect?" Throughout his opinion, Marshall focuses on the ques-

---

not assert that the information is inaccurate. Rather, it contends that the information does not justify the relief that Sampson seeks. Neither Sampson nor the government sought to present testimony or any additional evi-

dence. The court, however, reserved its right to receive and consider additional evidence if necessary to resolve Sampson's motions. *See* June 11, 2003 Tr. at 21–22.

tion whether the statute is consistent with the Constitution. And he concludes that "a law repugnant to the constitution is void." Under this view, now canonized in American law, the very meaning of an enforceable constitution is that an unconstitutional law may not be enforced.

Michael C. Dorf, "Facial Challenges to State and Federal Statutes," 46 *Stan. L.Rev.* 235, 247 (1994) (footnotes omitted).

Nevertheless, the questions remain: who can challenge the constitutionality of a statute; and by what standard is any such challenge to be decided.

As described below, the court has the authority to decide Sampson's Eighth Amendment claims, and prudential considerations make it appropriate to decide some but not all of them now. In addition, as explained more fully in § VII, *infra,* the court finds that *Salerno* does not provide the standard for deciding Sampson's Eighth Amendment claims.

Professor Richard Fallon has rightly written that:

> Both within the Supreme Court and among scholarly commentators, a debate rages over when litigants should be able to challenge statutes as "facially" invalid, rather than merely invalid "as applied." To a large extent, this debate reflects mistaken assumptions. There is no distinctive category of facial, as opposed to as-applied, litigation. All challenges to statutes arise when a litigant claims that a statute cannot be enforced against her..... [D]ebates about the permissibility of facial challenges should be recast as debates about the substantive test that should be applied to enforce particular constitutional provisions.

Richard H. Fallon, Jr., "As–Applied and Facial Challenges and Third–Party Standing," 113 *Harv. L.Rev.* 1321, 1321 (2000); *see also* Dorf, *supra;* Henry Paul Mona-

ghan, "Overbreadth," 1981 *Sup.Ct. Rev.* 1, 3–14 (1981).

The debate Professor Fallon describes is exemplified by the Supreme Court's decision in *Morales, supra.* Invalidating an anti-loitering ordinance on its face, Justice Stevens wrote for the plurality that:

> To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself .... When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question. In this sense, the threshold for facial challenges is a species of third party (*jus tertii* ) standing, which we have recognized as a prudential doctrine and not one mandated by Article III of the Constitution.

*Morales,* 527 U.S. at 55 n. 22, 119 S.Ct. 1849 (plurality opinion).

In his dissent, Justice Scalia acknowledged that the Court had often declared statutes to be unconstitutional not only as applied to the person before it but in all applications. *Id.* at 77, 119 S.Ct. 1849 (Scalia, J., dissenting). In his view, "it is highly questionable whether federal courts have any business making such a declaration." *Id.* at 74, 119 S.Ct. 1849.

However, Justice Scalia explained that his disagreement with the plurality was not about standing, but one of substantive law. As he wrote:

> Disagreement over the *Salerno* rule is not a disagreement over the "standing" question whether the person challenging the statute can raise the rights of third parties: under both *Salerno* and the plurality's rule he can. The disagreement relates to how many third-party rights he must prove to be infringed by

the statute before he can win: *Salerno* says "all" (in addition to his own rights), the plurality says "many." That is not a question of standing but of substantive law.

*Id.* at 79 n. 3, 119 S.Ct. 1849 (emphasis omitted).

The Supreme Court has often declared statutes to be overbroad and, therefore, unconstitutional when a violation of the First Amendment right to freedom of speech is alleged. *See, e.g., Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

Even outside the First Amendment context, the Court has not always required that a statute unlawfully affect a litigant before declaring it unconstitutionally overbroad on other grounds. For example, in *Casey,* 505 U.S. at 895, 112 S.Ct. 2791, the Supreme Court held that a statute regulating abortion was subject to a facial challenge and unconstitutional if "in a large fraction of the cases in which [it] is relevant, it will operate as a substantial obsta-

cle to a woman's choice to undergo an abortion." *See also Janklow v. Planned Parenthood,* 517 U.S. 1174, 1175–78 n. 1, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (mem. of Stevens, J., respecting the denial of the petition for a writ of certiorari). As discussed in § VII, *infra,* the dicta in *Salerno* that a challenger "must establish that no set of circumstance exists under which the Act would be valid" does not provide the proper test for deciding Sampson's claims that the FDPA violates the Eighth Amendment.

■ In any event, Sampson is the defendant in the instant case. There is, therefore, a genuine case and controversy that provides this court the authority to decide issues that are properly presented. *See* U.S. Const., Art. III; *Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc.,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *cf. Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978); *Harrison v. United States,* 359 F.2d 214, 228 n. 15 (D.C.Cir.1965); *United States v. Daniels,* 48 Fed. Appx. 409, 417–18 (3rd Cir.2002).[9] As Justices Stevens and Scalia agreed in *Morales,* 527 U.S. at 55 n. 22, 79 n. 3, 119 S.Ct. 1849, Sampson has standing to challenge the FDPA.

The key threshold question is whether any or all of his claims are ripe for resolution now. *See Reno v. Catholic Soc. Svcs., Inc.,* 509 U.S. 43, 58 n. 18, 113 S.Ct. 2485,

---

**9.** Because Sampson is a defendant in a pending case, the government's claim that *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) demonstrates that Sampson lacks standing to assert certain challenges to the FDPA is incorrect. Whitmore had exhausted his appeals and failed in his collateral challenges to his death sentence. *Id.* at 156, 110 S.Ct. 1717. Thus, the Supreme Court found that he lacked standing to intervene to appeal the death sentence imposed on another individual in order to develop a record that might be helpful to Whitmore on appeal if he somehow obtained a new trial

and was again sentenced to death. *Id.* at 156–57, 110 S.Ct. 1717. The Court found Whitmore's theory of injury to be too speculative to establish an Article III case or controversy. *Id.* at 157, 110 S.Ct. 1717.

In contrast, Sampson is a party to a pending case and will, as described *infra,* have the nature of his trial materially altered if the FDPA is constitutional. He might also be sentenced to death. Thus, in contrast to *Whitmore,* there is in this case a genuine Article III case or controversy and the resolution of the issues that Sampson present will have a direct and immediate impact on him.

125 L.Ed.2d 38 (1993); *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Stern v. United States District Court,* 214 F.3d 4, 10 (1st Cir.2000).

The Supreme Court has "noted that ripeness doctrine is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Catholic Soc. Svcs.,* 509 U.S. at 58 n. 18, 113 S.Ct. 2485. Thus, while the Article III requirement of a case and controversy is satisfied, prudential considerations may indicate that certain claims should not be decided by this court either before trial or at all.

As the First Circuit recently wrote:

Ripeness is dependent on the circumstances of a particular case. *See Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 535 (1st Cir.1995) ("[T]he various integers that enter into the ripeness equation play out quite differently from case to case . . . ."). Two factors are used to evaluate ripeness: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507, 18 L.Ed.2d 681. Ordinarily, both factors must be present. *Ernst & Young,* 45 F.3d at 535.

*Doe v. Bush,* 323 F.3d 133, 138 (1st Cir. 2003); *see also Stern,* 214 F.3d at 10.

Whether withholding judgment will impose hardship is an issue that typically depends on whether the challenged action creates a direct and immediate dilemma for the parties. *Abbott Laboratories* 387 U.S. at 152, 87 S.Ct. 1507; *Stern,* 214 F.3d at 10. As the Second Circuit recently explained in finding a pretrial challenge to the constitutionality of the FDPA to be ripe for adjudication:

[A] defendant suffers practical and legally-cognizable disadvantages by postponing a facial challenge to the death penalty until after trial. Quite apart from a defendant's obvious desire to know in advance whether he will be risking his life by going to trial, the District Court determined that a defendant may reasonably prefer the ordinary allocation of peremptory challenges—six for the government, ten for the defense—rather than the allocation in a capital case of twenty for each side. We also agree with the District Court that a defendant may reasonably prefer a jury on which persons who are conscientiously opposed to the death penalty are not excused for cause.[10]

Further, if the death penalty remains a possibility during trial, a defendant may be forced into trial tactics that are designed to avoid the death penalty but that have the consequence of making conviction more likely. Moreover, the possibility of capital punishment frequently induces defendants to enter into plea agreements in order to guarantee their own survival. And the Supreme Court has specifically held that "a plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty." *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Accordingly, to the extent that a defendant might be disposed to plead guilty before trial in order to avoid capital punishment, withholding consideration of a facial challenge to the death penalty until after trial, conviction and sentence could cause him substantial hardship.

---

**10.** Individuals whose principles would prevent them from imposing the death penalty in every case may not participate in a capital case. *See Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon,* 391 U.S. at 519, 88 S.Ct. 1770.

*Quinones*, 313 F.3d at 59 (footnote added). Thus, the hardship of withholding judicial judgment on Sampson's claims favors deciding them now.

However, only some, but not all, of Sampson's challenges are now fit for judicial decision. "Fitness 'typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.'" *Doe*, 323 F.3d at 138 (quoting *Ernst & Young*, 45 F.3d at 535). In this case, it also involves two additional considerations.

The first is the concept of comity. Sampson asserts that the FDPA does not provide constitutionally adequate appellate review. The proper scope of appellate review in this case is a question most appropriately left to the First Circuit, which can, if necessary, decide the degree of review that it will provide and then assess its constitutional adequacy. *See United States v. Cuff*, 38 F.Supp.2d 282, 286 (S.D.N.Y.1999).

Second, there may be a question of whether this court has the authority to grant Sampson any relief if a jury decides that he should be executed. Juries are regularly instructed that the court must impose the death sentence if that is the jury's verdict. *See* 18 U.S.C. § 3594; 1 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions*, Inst. 9A–1 at 9A–10. In *United States v. Lee*, 89 F.Supp.2d 1017, 1021 (E.D.Ark.2000), the government argued to the trial court that it had "no post-sentencing authority other than to sentence the Defendant as recommended by the jury," and, therefore, the district court lacked its usual power to grant a new trial pursuant to Federal Rule of Criminal Procedure 33. It appears that the government may not have maintained this position on appeal. *See United States v. Lee*, 274 F.3d 485, 493–96 (8th Cir.2001). In any event, the Eighth Circuit found that the district court had abused its discretion in granting a new trial, but did not hold that it lacked the authority to do so in an appropriate case. *Id.* Although this court has ordered the government to clarify its position on this question prior to trial, *Lee* suggests that the government might contend that this court has no authority to grant Sampson any relief if the jury decides that he should be executed. This provides another reason to decide Sampson's challenges to the FDPA before trial.

■ The fitness and hardship factors in the instant case suggest different results for different facial challenges. The record is complete with regard to Sampson's claim that the death penalty inherently constitutes cruel and unusual punishment (Point Thirteen). It is also complete with regard to his related claims that the FDPA is unconstitutional because the death penalty is rarely sought or imposed (Point One), the death penalty is arbitrarily imposed (Point Two), the death penalty is imposed on the invidious basis of race and the irrational basis of geography (Point Three), and the death penalty involves the unacceptable risk of executing the innocent (Point Four). Sampson's assertion that the FDPA does not authorize the allegation of non-statutory aggravating factors (Point Seven) or, if it does, involves an unlawful delegation of legislative power (Point Ten) are pure legal questions and, therefore, amenable to being decided now. As explained *infra*, the remainder of Sampson's claims are not yet completely ripe.

## VI. THE SUPREME COURT HAS HELD THAT THE DEATH PENALTY IS NOT INHERENTLY CRUEL AND UNUSUAL

Sampson argues that this court should find that the death penalty is simply cruel

and unusual and, therefore, declare the FDPA to be unconstitutional. However, as the government asserts, the Supreme Court has decided this issue and found that imposing the death penalty as a punishment for murder is not unconstitutional *per se.* In 1976, in *Gregg,* the Supreme Court stated that:

> [W]e are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime.... We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.

428 U.S. at 187, 96 S.Ct. 2909 (footnote omitted); *accord Roberts v. Louisiana,* 428 U.S. 325, 331, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *see McCleskey,* 481 U.S. at 301, 107 S.Ct. 1756.

If the Supreme Court has directly decided an issue, the lower courts must reach the same result "unless and until [the] Court reinterpret[s] the binding precedent." *Agostini v. Felton,* 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of [the Supreme] Court has direct application in a case ... the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."); *Quinones,* 313 F.3d 49, 62 n. 10, 69, 70. Thus, this court does not have the authority to find the death penalty to be inherently cruel and unusual punishment and to declare the FDPA unconstitutional solely on this basis, without regard to the way the statute is written or operates.

However, in *Gregg* the Supreme Court expressly recognized that future developments might alter its assessment of the constitutionality of the death penalty. As described earlier, the Court reiterated in *Gregg* that the Eighth Amendment would " 'draw its meaning from [ ] evolving standards of decency...' " *Gregg,* 428 U.S. at 173, 96 S.Ct. 2909 (quoting *Trop,* 356 U.S. at 101, 78 S.Ct. 590). The Court also implicitly acknowledged that future developments might challenge the basis of its decision, stating that it was "require[d][ ] to conclude, *in the absence of more convincing evidence,* that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe." *Id.* at 187, 96 S.Ct. 2909 (emphasis added).

As explained in § VII, *infra,* since 1976 substantial and significant new evidence has emerged concerning the operation of the statutes that authorize the imposition of the death penalty, particularly with regard to the frequency with which innocent individuals are sentenced to death. The objective evidence to date does not persuade the court that the FDPA should now be declared unconstitutional. However, as also discussed below, the increasing and disturbing new evidence concerning the execution of the innocent may generate legislation and jury verdicts which manifest a public consensus that the death penalty offends contemporary standards of decency and should no longer be deemed by the courts to be constitutionally acceptable.

## VII. THE FDPA IS NOT NOW UNCONSTITUTIONAL BECAUSE OF THE RISK OF EXECUTING THE INNOCENT

In *U.S. v. Quinones,* 196 F.Supp.2d 416 (S.D.N.Y.2002) and *U.S. v. Quinones,* 205 F.Supp.2d 256 (S.D.N.Y.2002), District

Judge Rakoff concluded that the FDPA is unconstitutional because it will result in the execution of individuals who are actually innocent. Sampson urges this court to do the same despite the reversal of the District Court's decision in *Quinones* by the Second Circuit. *See Quinones*, 313 F.3d at 70 (2d Cir.2002), *reh'g denied*, 317 F.3d 86 (2d Cir.2003).

The government first argues that the court should not now decide the merits of this claim, but rather should defer a decision at least until a jury decides whether Sampson should be executed. This is the position that the government took before the District Court in *Quinones*, but abandoned on appeal. *Compare Quinones*, 205 F.Supp.2d at 257 *with* 313 F.3d at 57 (internal quotation marks omitted). On appeal the government in *Quinones* stated that it was not claiming that the issue was not ripe for adjudication because "the district court's decision did not rely in any way on anything that might happen at trial." *Quinones*, 313 F.3d at 57 (internal quotation marks omitted). The same is true in the instant case. As described in § V, *supra*, the Second Circuit found that the question presented in *Quinones* was ripe for decision. *Id.* at 59. For similar reasons, this court finds that the similar questions presented in the instant case can and should be decided now, as they have been decided before trial in other cases after *Quinones*. *See United States v. Davis*, No. Cr. A. 01–282, 2003 WL 1837701 (E.D.La. Apr. 9, 2003); *United States v. Denis*, 246 F.Supp.2d 1250 (S.D.Fla.2002); *United States v. Church*, 217 F.Supp.2d 700 (W.D.Va.2002); *United States v. O'Driscoll*, No. 4:CR–01–277, 2002 WL 32063823 (M.D.Pa. Sept. 16, 2002).

This conclusion is not qualified by the fact that Sampson does not claim to be actually innocent himself. Rather, as described in § V, *supra*, he asserts an alleged right not to be prosecuted or punished pursuant to an unconstitutional statute. Like the defendants in *Quinones* who had not admitted their guilt, as a matter of law Sampson is presumed to be innocent unless and until he pleads guilty or is convicted. He is, therefore, similarly situated to the defendants in *Quinones*.

█ The court recognizes that because he admits that he committed the murders involved in the instant case, Sampson is not a sympathetic proponent of the position that the FDPA is unconstitutional because it will inevitably result in the execution of innocent individuals. However, it is axiomatic that issues properly presented must be decided based on neutral principles. "A principled decision ... is one that rests on reasons ... that in their generality and their neutrality transcend any immediate result that is involved." Herbert Wechsler, "Toward Neutral Principles of Constitutional Law," *in Principles, Politics & Fundamental Law* 3, 27 (1961). Thus, it is the court's duty to decide the constitutional issues which are properly presented and ripe for resolution without regard to Sampson's particular circumstances.

Sampson's contention that the FDPA will inevitably result in the execution of innocent individuals presents two questions. The first question is whether the increasing evidence that innocent individuals have been convicted and sentenced to death should result in the recognition of a constitutional right of a person to continue to attempt to prove his innocence throughout his natural life. This is a claim based on an alleged Fifth Amendment right to procedural due process. The second question is whether that evidence renders the FDPA cruel and unusual punishment and, therefore, unconstitutional under the Eighth Amendment.

In *Quinones,* the Second Circuit held that the Supreme Court's decision in *Herrera* decided both of these issues adverse to the defendants. *See Quinones,* 313 F.3d at 68–69; *see also O'Driscoll,* 2002 WL 32063823, at *2; *Church,* 217 F.Supp.2d at 701–02. The First Circuit recently wrote, however, that "[i]t is not clear whether a habeas claim could be based on new evidence *proving* actual innocence ..." *Conley v. United States,* 323 F.3d 7, 14 n. 6 (1st Cir.2003); *accord David v. Hall,* 318 F.3d 343, 347–48 (1st Cir.2003) (emphasis in original). This court finds that: (1) the holding in *Herrera* does not foreclose a procedural due process claim in every instance; and (2) *Herrera* did not decide Sampson's Eighth Amendment claim.

More specifically, Herrera had been convicted, sentenced to death, and exhausted his rights to collaterally challenge his conviction and sentence in state and federal court. *Herrera,* 506 U.S. at 395–96, 113 S.Ct. 853. While awaiting execution, Herrera filed affidavits tending to show that his dead brother committed the crime for which Herrera had been convicted. The affidavits were submitted in support of a second petition for habeas corpus in federal court seeking a new trial based on the new evidence of Herrera's alleged actual innocence. *Id.* at 396–97, 113 S.Ct. 853.

Writing for the majority, Chief Justice Rehnquist stated that: "Petitioner urges us to hold that *this showing* of innocence entitles him to relief in this federal habeas proceeding. We hold that it does not." *Id.* at 393, 113 S.Ct. 853 (emphasis added). The Chief Justice explained that:

Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.

\* \* \* \* \* \*

This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.

*Id.* at 400, 113 S.Ct. 853. The Chief Justice also wrote that:

Our federal habeas cases have treated claims of "actual innocence," not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive. History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency.

*Id.* at 416–17, 113 S.Ct. 853.

The Chief Justice concluded, however, by stating that:

We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

*Id.* at 417, 113 S.Ct. 853. Thus, while *Herrera* may suggest that a person convicted and sentenced to death does not

have a right to remain alive in order to seek federal habeas corpus relief if he acquires new evidence of his actual innocence, as stated at the outset of the decision, *id.* at 393, 113 S.Ct. 853, the Court actually only held that the petitioner did not present sufficient evidence to justify such relief.

In *Quinones,* the Second Circuit interpreted the holding of *Herrera* more expansively. It wrote, in pertinent part:

> [D]espite its recognition of the "unalterable fact that our judicial system, like the human beings who administer it, is fallible," *id.* at 415, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203, the Court held in *Herrera* that a state's refusal to grant a new trial to a capital defendant based upon newly-discovered evidence that could prove his innocence does not "transgress[ ] a principle of fundamental fairness rooted in the traditions and conscience of our people," *id.* at 411, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203, (internal quotation marks omitted). The Supreme Court thereby made clear that, once an individual has exhausted his available legal remedies, the Due Process Clause no longer entitles him to an opportunity to demonstrate his innocence. Accordingly, the Supreme Court established in *Herrera* that there is no fundamental right to the opportunity for exoneration even before one's execution date, much less during the entire course of one's natural lifetime.

313 F.3d at 68–69.

It does not matter in the instant case whether *Herrera* decided that there is no constitutional right to present evidence of actual innocence after a person has exhausted all forms of post-conviction relief provided by statute. Sampson has not yet

been convicted. More significantly, he admits that he is guilty of at least the capital offense of stealing Rizzo's car with the requisite intent to cause serious bodily harm or death.[11] *See* June 11, 2003 Tr. at 72–43; Def.'s Resp. to Gov.'s Mot. for Prot. Order at 2.

In *Quinones,* the Second Circuit went on to find that *Herrera* also decided and foreclosed a defendant's Eighth Amendment (or Fifth Amendment substantive due process) claim. More specifically, it wrote:

> *Herrera* prevents us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent. And the Supreme Court has expressly mandated that "[i]f a precedent of this Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *see also Agostini v. Felton,* 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (holding that lower courts must follow Supreme Court case law "unless and until this Court reinterpret[s] the binding precedent").

*Id.* at 69.

This court respectfully disagrees with the Second Circuit's interpretation of *Herrera* on this point. In *Herrera,* Chief Justice Rehnquist explicitly explained that the Supreme Court was deciding only a procedural due process claim when he wrote:

> [P]etitioner does not come before this Court as an innocent man, but rather as one who has been convicted by due pro-

---

11. While Sampson has sought to plead guilty to the charge of attempting to steal McCloskey's car with intent to murder him, Sampson's recent submissions suggest that he may at trial contest whether he had the state of mind necessary to render the murder of McCloskey, which he still admits, a capital offense. *See* Def.'s Trial Brief at 1–2.

cess of law of two capital murders. *The question before us, then, is not whether due process prohibits the execution of an innocent person,* but rather whether it entitles petitioner to judicial review of his "actual innocence" claim. *This issue is properly analyzed only in terms of procedural due process.* 506 U.S. at 407 n. 6, 113 S.Ct. 853 (emphasis added). Consistent with this, Justices O'Connor and Kennedy stated that "[n]owhere [in *Herrera*] does the Court state that the Constitution permits the execution of an actually innocent person." *Id.* at 427, 113 S.Ct. 853 (O'Connor, J. and Kennedy, J., concurring).

In *Herrera,* a majority of the Justices stated that the execution of an innocent person would violate the Constitution. Justices O'Connor and Kennedy wrote in their concurrence that it is a "fundamental legal principle that executing the innocent is inconsistent with the Constitution." *Id.* at 419, 113 S.Ct. 853 (O'Connor, J. and Kennedy, J., concurring). In their dissent, Justices Blackmun, Stevens, and Souter wrote that: "[n]othing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent." *Id.* at 430, 113 S.Ct. 853 (internal citations omitted) (Blackmun, J., Stevens, J., and Souter, J., dissenting). Like Chief Justice Rehnquist, *id.* at 417, 113 S.Ct. 853, Justice White assumed that the execution of persons shown to be actually innocent would be unconstitutional. *Id.* at 429, 113 S.Ct. 853 (White, J., concurring).

This court agrees that "executing the innocent is inconsistent with the Constitution." *Id.* at 419, 113 S.Ct. 853 (O'Connor, J. and Kennedy, J., concurring). The open issues in this case are whether the FDPA will inevitably result in the execution of innocent individuals and, if so, whether this renders the statute unconstitutional, and inapplicable to Sampson because it is

an invalid law. For the reasons described below, the court finds that: the FDPA will inevitably result in the execution of innocent individuals; there is not now, however, a proper basis to declare the FDPA unconstitutional for this reason; and, therefore, it is not necessary to decide Sampson's claim that he has a right not to be tried under an unconstitutional statute.

As the government argues, the risk that an innocent person would be executed has long been recognized. *See Quinones,* 313 F.3d at 63–67. This risk was considered in 1972 in *Furman,* but was accepted only by Justices Marshall and Brennan as a reason to invalidate statutes providing for capital punishment. *See Furman,* 408 U.S. at 364, 366–68, 92 S.Ct. 2726 (Marshall, J., concurring), 290–91, 92 S.Ct. 2726 (Brennan, J., concurring); *Quinones,* 313 F.3d at 65–67. The risk of executing innocent individuals was also acknowledged by the Supreme Court in 1993, in *Herrera. See* 506 U.S. at 415, 113 S.Ct. 853. In addition, this risk was discussed in Congress prior to the enactment of the FDPA in 1994. *Quinones,* 313 F.3d at 64. However, "none of the committee reports that comprise the primary legislative history of the Federal Death Penalty Act contains even a single passage supporting the Government's claim" that Congress "'well understood—and fully debated—whether the FDPA should be given effect despite the risk that innocent individuals might be sentenced to death.'" *Quinones,* 205 F.Supp.2d at 260.

Significantly, after studying a record that was also presented to this court, *see* A–96 to A–284, the district court in *Quinones* accurately described the evidence that has emerged in the past decade concerning the reality and dimensions of the risk that death penalty statutes will result in the execution of innocent individuals.

Most striking are the results obtained through the use of post-conviction testing with deoxyribonucleic acid ("DNA"). Although DNA testing is of remarkably high reliability, its value as a forensic tool in criminal investigations was not demonstrated until 1985 and its use in re-evaluating prior convictions was only beginning at the time *Herrera* was decided in 1993. Yet in just the few years since then, DNA testing has established the factual innocence of no fewer than 12 inmates on death row, some of whom came within days of being executed and all of whom have now been released. This alone strongly suggests that more than a few people have been executed in recent decades whose innocence, otherwise unapparent to either the executive or judicial branches, would have been conclusively established by DNA testing if it had been available in their cases.

The problem, however, goes well beyond the issue of the availability of DNA testing. Indeed, the success of DNA testing in uncovering the innocence of death row defendants has itself helped spark reinvestigation of numerous other capital cases as to which DNA testing is unavailable or irrelevant but as to which other techniques can be applied. Partly as a result, in just the past decade, at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution have been exonerated and released. Again, the inference is unmistakable that numerous innocent people have been executed whose innocence might otherwise have been similarly established, whether by newly-developed scientific techniques, newly-discovered evidence, or simply renewed attention to their cases.

*Quinones,* 196 F.Supp.2d at 417–18 (footnotes omitted); *see also Quinones,* 205 F.Supp.2d at 265.

Since 1973, more than 100 innocent people have been released from death rows.

*See* A–27, Death Penalty Information Center, "Facts About the Death Penalty"; A–97, Affidavit of Richard Dieter. In January 2003, the Governor of Illinois commuted the death sentences of more than 150 individuals awaiting execution in that state after previously determining that seventeen people on Illinois' death row were actually innocent. *See* A–288; *see also* Alex Kotlowitz, "In the Face of Death," *N.Y. Times Sunday Magazine,* July 6, 2003, at 32, 34. One of those individuals was "Anthony Porter, who spent no less than 16 years on death row until prosecutors decided they had made a mistake (upon which determination they then brought murder charges against a different suspect, who confessed)." *Quinones,* 205 F.Supp.2d at 265.

Moreover:

It was not until the year 2000 . . . that Professor James S. Liebman and his colleagues at Columbia Law School released the results of the first comprehensive study ever undertaken of modern American capital appeals (4,578 appeals between 1973 and 1995). That study, though based only on those errors judicially identified on appeal, concluded that "the overall rate of prejudicial error in the American capital punishment system" is a remarkable 68%. James S. Liebman, et al., *A Broken System: Error Rates in Capital Cases* (2000) at ii.

*Quinones,* 196 F.Supp.2d at 418.

The authors of that study later wrote:

Looking at thousands of death verdicts reviewed by courts in 34 states over 23 years, we found that nearly seven in 10 were thrown out for serious error, requiring 2,370 retrials. For cases whose outcomes are known, an astonishing 82% of retried death row inmates turned out not to deserve the death penalty; 7% were not guilty. The process took nine

years on average. Put simply, most death verdicts are too flawed to carry out, and most flawed ones are scrapped for good. One in 20 death row inmates is later found not guilty.

A–284, James Liebman, *et al.*, "Technical Errors Can Kill," *Nat'l L. J.*, Sept. 4, 2000, at A16.

These developments have been recognized and been relied upon by the Supreme Court. In reversing *Penry* the Supreme Court declared that it is no longer constitutionally permissible to execute the retarded in part because they "face a special risk of wrongful execution." *Atkins*, 536 U.S. at 321, 122 S.Ct. 2242. The Court also stated that "we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated." *Id.* at 320 n. 25, 122 S.Ct. 2242.

The government correctly asserts that the foregoing statistics relate to convictions obtained in state courts rather than under the FDPA. It contends that similar errors and injustices could not occur in the federal courts. *See* June 11, 2003 Tr. at 52; *see also Denis*, 246 F.Supp.2d at 1253; *Church*, 217 F.Supp.2d at 702. Therefore, the government argues that the facts which the Supreme Court found disturbing in *Atkins* should not affect an assessment of the constitutionality of the FDPA. *Id.*

The government's confidence that the FDPA will never lead to the execution of innocent individuals ·is not shared by the only federal judge to have presided over an FDPA prosecution in Massachusetts. Judge Ponsor conducted the trial of Kristen Gilbert, a nurse convicted of murdering four of her patients and attempting to murder three others. She was sentenced to life in prison in 2001. Judge Ponsor later wrote regarding the *Gilbert* trial that:

The experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably execute innocent people—not too often, one hopes, but undoubtedly sometimes.

\* \* \* \* \* \*

... I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.

A–90, A–95, Michael Ponsor, "Life, Death and Uncertainty," *Boston Globe*, July 8, 2001, at D2.

Commonsense, the experience to date in this case, and evidence from other cases combine to persuade this court that Judge Ponsor's prediction is prophetic. Federal judges, like state judges, are human and, therefore, fallible. Indeed, many federal judges have previously been state judges. Jurors in federal cases are essentially the same citizens who serve as jurors in state cases. In addition, many federal cases, including the instant case, result from investigations conducted primarily, if not exclusively, by state and local law enforcement agents.

As the District Court wrote in *Quinones*, "while it is true that none of the 31 persons so far sentenced to death under the Federal Death Penalty Act [as of July 2001] has been subsequently exonerated ..., the sample is too small, and the convictions too recent, to draw any conclusions therefrom." *Quinones*, 205 ·F.Supp.2d at 266. However, five of those thirty-one death sentences had been reversed. *Id.* Moreover, as the District Court explained in contrasting the FDPA and many state death penalty statutes, "certain federal practices present a greater risk of wrongful capital convictions than parallel state practices." *Id.* at 267.

In any event, it is evident that errors are made in federal capital cases. Some errors may be caught. Some of those will

be corrected at trial or on appeal. There is good reason to believe, however, that others will not be caught or corrected.[12]

In *Gilbert*, the government intended to rely heavily on toxicological evidence that the defendant had poisoned her patients. As Judge Ponsor wrote:

> In his opening, the prosecutor promised that the jury would hear a nationally renowned expert opine that post-mortem examination clearly revealed epinephrine poisoning. Halfway through the trial, he had to admit that on reexamination the results were inconclusive. His renowned expert, it seemed, had made a math error.

A–91, Ponsor, *supra*.

The instant case also illustrates the potential for serious imperfections in a federal capital case. Since surrendering, Sampson has asserted that before committing the murders involved in this case, he called the FBI and asked that federal agents arrest him for the bank robberies he had committed in North Carolina. *See United States v. Anderson*, 249 F.Supp.2d 30, 31–

32 (D.Mass.2003); *United States v. Anderson*, 229 F.Supp.2d 17, 19 (D.Mass. 2002). The FBI, however, did not respond to his call. *Id.*

Sampson's counsel promptly publicly proclaimed that he would rely heavily on the telephone call to the FBI as a mitigating factor in the effort to persuade the jury not to sentence Sampson to death. *Anderson*, 260 F.Supp.2d at 315–16; *Anderson*, 249 F.Supp.2d at 32. Initially, the government questioned Sampson's claim that he had called the FBI. *See Anderson*, 229 F.Supp.2d at 19–20. For several months, an FBI employee, William Anderson, repeatedly denied receiving Sampson's call. *Id.; Anderson*, 260 F.Supp.2d at 313–14. Anderson did not admit that he had received Sampson's call until he was informed that he had failed a polygraph examination on this question. *Id.*

Moreover, in its unsuccessful effort to persuade this court not to sentence Anderson to prison, the government asserted that he had not been administered

---

**12.** The courts cannot always be relied upon to decide whether harmful error has occurred in a capital case even when some Supreme Court Justices perceive that a serious issue exists. For example:

> In at least two cases, the Supreme Court has granted certiorari in a death case but could not get the requisite five votes to stay the execution. The first was in *Hamilton v. Texas*, 497 U.S. 1016, 110 S.Ct. 3262, 111 L.Ed.2d 772 (1990), and the second was *Herrera v. Collins*, 502 U.S. 1085, 112 S.Ct. 1074, 117 L.Ed.2d 279 (1992). In both cases, there were four votes to grant certiorari, but no fifth vote to stay the execution. In *Hamilton*, the petitioner was executed before the Court could hear his case, and his case was dismissed as moot. In *Herrera*, the Texas Court of Criminal Appeals stayed the petitioner's execution in order to permit the case to be heard by the Supreme Court, but only after the Supreme Court itself refused to do so. The Court decided against Herrera, and he was then executed.

> In addition, at least three times in the mid–1980s, the Supreme Court had voted to hold a case (a decision requiring only three votes) pending the disposition of another case raising the same issue, but refused to stay the execution in the held case. See *Straight v. Wainwright*, 476 U.S. 1132, 106 S.Ct. 2004, 90 L.Ed.2d 683 (1986) (four votes to hold the case pending the decision in *Darden v. Wainwright*, no fifth vote to stay execution); *Watson v. Butler*, 483 U.S. 1037, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987) (four votes to hold the case pending the decision in *Franklin v. Lynaugh*, Court split 4–4 on stay of execution because Justice Powell had retired and no ninth justice had yet been appointed to replace him); and *Streetman v. Lynaugh*, 484 U.S. 992, 108 S.Ct. 588, 98 L.Ed.2d 634 (1988) (case held pending the decision in *Lowenfield v. Phelps*, but execution not stayed).

Alan Dershowitz, *Supreme Injustice* 221 n. 86 (2001); *see also* John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.* 445–46 (1994).

an oath before providing the false statement for which he was being prosecuted. *See Anderson*, 249 F.Supp.2d at 31. The court, however, read the investigator's interview report and pointed out that it stated "that Anderson was placed under oath before he was interviewed and later provided a sworn affidavit memorializing his earlier, sworn oral statements." *Id.* Only then did the government admit that it had misrepresented what had occurred. *See Anderson*, 249 F.Supp.2d at 60.

Important errors are, however, not always identified prior to death sentences being imposed, at times because of deliberate misconduct by federal investigators. In *Furman*, Justice Marshall recognized the possibility that perjured testimony could produce an unwarranted death sentence. 408 U.S. at 367, 92 S.Ct. 2726 (Marshall, J., concurring). It is now clear that this has occurred.

In 2001, a District Attorney in Massachusetts stated that "a great wrong was committed" when, in 1967, Peter Limone and others were unfairly convicted and sentenced to death because the FBI had withheld information that its informants, rather than the defendants, had murdered Edward Deegan, and had allowed its informants to testify falsely against the four innocent men. *See* Carey Goldberg, "An Innocent Man Goes Free 33 Years After Conviction," *N.Y. Times*, Feb. 2, 2001 at A12; *see also Flemmi*, 195 F.Supp.2d at 251. After the death penalty was declared unconstitutional in *Furman*, the Supreme Court vacated the death sentences. *See Limone v. Massachusetts*, 408 U.S. 936, 92 S.Ct. 2848, 33 L.Ed.2d 754 (1972); *Anderson*, 260 F.Supp.2d at 316 n. 4. Two of the wrongfully convicted men died while serving life sentences. *Anderson*, 260 F.Supp.2d at 316 n. 4. Joseph Salvati, who had originally received a life sentence, had his sentence commuted and was released in 1997. *Id.* Limone was released in 2001,

after his wrongful conviction had been demonstrated. *Id.*

The deliberate misconduct by federal investigators that was so belatedly demonstrated with regard to Salvati and Limone is neither ancient history nor unique to Massachusetts. Daniel Bright was convicted of murder in New Orleans, Louisiana in 1996. *See Bright*, 259 F.Supp.2d at 497. He was sentenced to be executed. *See State v. Bright*, 776 So.2d 1134, 1136 (La.2000). In connection with his petition for habeas corpus, Bright filed a Freedom of Information Act ("FOIA") request with the FBI. *Bright*, 259 F.Supp.2d at 497. Initially, the FBI responded that it was unable to locate any records relating to Bright. *Id.* at 497 n. 1. Eventually, certain documents were disclosed in redacted form, purportedly to protect the identity of informants. *Id.* at 497–501. The District Court, however, ordered the government to provide the unredacted documents for its *in camera* review. *Id.* at 501.

That review demonstrated that the FBI had misrepresented the nature of the redacted information by falsely claiming that it involved Bright blaming Tracy Davis for the murder at issue. *See Bright*, 259 F.Supp.2d at 502–03 n. 1. The District Court found that the FBI had withheld from Bright, both prior to trial and in response to his FOIA request, evidence that *Davis* had admitted to another prisoner that *he* had committed the murder for which Bright was then charged, and was later convicted and sentenced to death. *Id.* More specifically, the court wrote:

> The reference that is related to Bright's murder conviction is not exempt from disclosure. 5 U.S.C. § 552(b)(7)(C), (D). It relates to the possibility of Bright's innocence and should have at the least been disclosed to him prior to his trial under the clear instruction of the Supreme Court in

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The reference itself states:

> The source further advised that DANIEL BRIGHT, aka "Poonie", is in jail for the murder committed by TRACEY DAVIS. The source stated that he/she has heard DAVIS bragging about doing the murder and how he is confident that BRIGHT will be able to beat the charge because they don't have enough evidence against him.

Quite obviously, disclosure of this material does not necessarily endanger the identity of the FBI source; given the patent seriousness of the statement, Bright may have been wrongfully convicted of murder even though his prior criminal history hardly makes him a candidate for citizen of the year. The failure by law enforcement agencies to disclose the statement before his murder trial raises the stakes of the public interest and pays little currency to any claim of private interest. Whether Bright is or is not guilty, the failure of law enforcement to act as it was constitutionally obliged to do cannot be tolerated in a society that makes a fair and impartial trial a cornerstone of our liberty from government misconduct.

*Id.* (footnote omitted).

The misconduct belatedly revealed with regard to Salvati and Bright is not unique

to the FBI. Citing numerous examples from their study, Professor Liebman and his colleagues concluded that one of the two most common errors prompting the reversal of state convictions in cases in which the defendant was sentenced to death was the improper failure of police or prosecutors to disclose "important evidence that the defendant was innocent or did not deserve to die." James S. Liebman, *et al., A Broken System: Error Rates in Capital Cases, 1973–1995* at ii (2000).[13] As described earlier, the performance of state and local police and prosecutors is important to the operation of the FDPA because many cases, including this one, have been initially investigated by them and later brought in federal court, at times in an effort to achieve a death sentence that is not available under state law.

In view of the foregoing, this court agrees with the trial judges in *Quinones* and *United States v. Gilbert,* 120 F.Supp.2d 147 (D.Mass.2000) that the FDPA, like the state death penalty statutes, will inevitably result in the execution of innocent people. As described earlier, a majority of the Justices who decided *Herrera* stated that the execution of an innocent person would be unconstitutional. *See* 506 U.S. at 419, 113 S.Ct. 853 (O'Connor, J. and Kennedy, J., concurring), 430 (Blackmun, J., Stevens, J., Souter, J., dis-

---

**13.** These examples are catalogued in Appendix C to the Liebman Study, which is available online at http://justice.policy.net/jpreport/liebapp5.pdf (last visited Aug. 7, 2003). *See, e.g., Hamilton v. State,* 677 So.2d 1254 (Ala.Crim.App.1995) (reversing conviction because prosecution witness committed perjury and state failed to disclose promise of early release in exchange for testimony); *Nelson v. Zant,* 261 Ga. 358, 405 S.E.2d 250 (1991) (reversing conviction because state suppressed FBI report that hair sample was not suitable for comparison); *People v. Jimerson,* 166 Ill.2d 211, 209 Ill.Dec. 738, 652 N.E.2d 278 (1995) (reversing conviction when prosecution allowed sole witness connecting defendant to crime to perjure herself regarding state's promise to drop murder charge against her in exchange for testimony); *Mazzan v. Warden,* 116 Nev. 48, 993 P.2d 25 (2000) (reversing conviction because state failed to turn over police reports containing exculpatory evidence); *Ex Parte Adams,* 768 S.W.2d 281 (Tex.Crim.App.1989) (granting new trial because of failure to disclose prior inconsistent statement of witness, misidentification of defendant by witness, and improper coaching of witness by police).

senting). The question, therefore, is whether the FDPA is unconstitutional because it will result in the execution of innocent people.

The standard to be utilized in deciding this question must be identified. As indicated earlier, the government contends that the proper test was stated by the Supreme Court in *Salerno* when it wrote that to prove that a statute is unconstitutional on its face "the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745, 107 S.Ct. 2095.

However, as also explained earlier, in *Morales* the plurality stated that "[t]o the extent that [the Supreme Court has] consistently articulated a clear standard for facial challenges, it is not the *Salerno* formula, which has never been the decisive factor in any decision of this Court, including *Salerno* itself. . . ." 527 U.S. at 55 n. 22, 119 S.Ct. 1849; *see also Washington v. Glucksberg,* 521 U.S. 702, 739–40 nn. 6–7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments). As Justice Stevens has written, "*Salerno's* rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context." *Janklow,* 517 U.S. at 1175, 116 S.Ct. 1582 (mem. of Stevens, J., respecting the denial of the petition for a writ of certiorari); *see also Glucksberg,* 521 U.S. at 740 n. 7, 117 S.Ct. 2258 (Stevens, J., concurring in the judgments).

Similarly, the *Salerno* dicta has never been essential to the resolution of any case decided by the First Circuit. In the two First Circuit cases that cited it concerning facial challenges, *Salerno* was not necessary to the decision in view of other earlier cases cited concurrently. *See Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 77 (1st Cir.2001) (immediately after citing *Salerno* citing *Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982) for the prop-

osition that "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute"); *Donovan v. City of Haverhill,* 311 F.3d 74, 77 (1st Cir.2002) (citing both *Salerno* and *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) for the proposition that a litigant raising a vagueness challenge to a statute that does not regulate constitutionally protected conduct faces a difficult challenge and must surmount a high hurdle by showing that no standard of conduct is specified at all). Indeed, in *Pharmaceutical Research,* District Judge Keeton, sitting by designation, noted the debate over *Salerno* in his concurring opinion, but concluded that "[w]e need not reach the issue of the applicability of the *Salerno* test." *Pharm. Research,* 249 F.3d at 94–95 (Keeton, J., concurring).

This court finds that the *Salerno* dicta does not provide the proper test for deciding Sampson's claim that the FDPA is unconstitutional because it will inevitably cause the execution of innocent individuals. As described earlier, that dicta would require that the statute be upheld unless it would be unconstitutional as applied to everyone. *See Salerno,* 481 U.S. at 745, 107 S.Ct. 2095; *Morales,* 527 U.S. at 80 n. 3, 119 S.Ct. 1849 (Scalia, J., dissenting). Therefore, under this standard the FDPA would be constitutional if 99 times out of 100 it resulted in the execution of an innocent individual because there would be one case in which a guilty person was executed.

However, as explained earlier, in *Herrera* a majority of the Justices stated that the execution of an innocent individual would be unconstitutional and two others assumed that it would be. *See Herrera,* 506 U.S. at 417, 419, 428, 430, 113 S.Ct. 853. This court is confident that a statute that resulted in the execution of innocent

individuals in 99% of all cases would be found to impose cruel and unusual punishment and, therefore, be unconstitutional. Thus, the relevant question concerning the constitutionality of the FDPA on this issue is not provided by the dicta in *Salerno.* Rather, it is how large a fraction of the executed must be innocent to offend contemporary standards of decency.

As described earlier, the Supreme Court has held that a statute regulating abortion was subject to a facial challenge and unconstitutional if "in a large fraction of the cases in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791. In *Casey,* the statutory requirement that a husband be notified before his wife had an abortion actually impacted about 1% of the women who seek abortions. *Id.* at 894–95, 112 S.Ct. 2791. Nevertheless, the requirement was declared unconstitutional on its face. *Id.* at 898, 112 S.Ct. 2791.

As Justice Stevens has explained, a similar analysis has been employed by the Supreme Court in other cases involving neither freedom of speech nor abortion. *See Janklow,* 517 U.S. at 1175 n. 1, 116 S.Ct. 1582 (mem. of Stevens, J., respecting the denial of the petition for a writ of certiorari). Thus, in the instant case the question is properly framed as "how many third-party rights [Sampson] must prove to be infringed by the [FDPA] before he can win" by establishing that the statute

offends contemporary standards of decency and, therefore, violates the Eighth Amendment. *Morales,* 527 U.S. at 79 n. 3, 119 S.Ct. 1849 (emphasis omitted) (Scalia, J., dissenting).

As described earlier, "evolving standards of decency" must be ascertained from "objective factors to the maximum possible extent." *Atkins,* 536 U.S. at 312, 122 S.Ct. 2242. A comparison of the instant case with *Atkins* indicates that there is some objective evidence that the death penalty offends contemporary standards of decency, but not enough for a court to declare the FDPA unconstitutional.

As indicated earlier, the Supreme Court in 1976 found the death penalty constitutional in part because "[t]he imposition of the death penalty for the crime of murder ha[d] a long history of acceptance both in the United States and in England." *Gregg,* 428 U.S. at 176, 96 S.Ct. 2909. However, the death penalty for murder was abolished in England prior to 1970. *See* Public Record Office, "The Ultimate Punishment," *at* http://www.pro.gov.uk/inthenews/Capital–Pun/capi–1.htm (last visited Aug. 3, 2003). *See also* Harold Hongju Koh, "Paying 'Decent Respect' to World Opinion on the Death Penalty," 35 *U.C. Davis L.Rev.* 1085, 1094 (2002).[14] It has also been abolished "by other nations that share our Anglo–American heritage, and by the leading members of the Western European community." *Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242; Koh, *supra,* at

---

14. The British are now firmly opposed to the death penalty.

British Foreign Office Minister Ben Bradshaw, when addressing the possibility that three British citizens being held at the U.S. naval base at Guantanamo Bay could be subject to capital punishment after being tried in a military tribunal, stated: "The British Government regularly, in cases where the death penalty may be imposed on British citizens, makes our views on the death penalty very plain to the American

authorities. We are opposed to the death penalty."

Death Penalty Information Center, *The Death Penalty in 2002: Year End Report* 7 (2002). As a result of such protests, "[t]he Bush administration has assured the British government that it will not seek the death penalty for two Britons being held as terrorist suspects at the American naval basis in Guantanamo Bay, Cuba." Sarah Lyall, "Death Penalty Ruled Out for Two British Detainees," *N.Y. Times,* July 23, 2003, at A4.

1094. Although this is not of primary importance, it is cognizable evidence of contemporary standards of decency. *Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242; *Thompson,* 487 U.S. at 830, 831 n. 31, 108 S.Ct. 2687.

Opinion polls also provide some guidance in determining contemporary standards. *Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242. A May 2003 Gallup Poll found that "73% of Americans believe an innocent person has been executed under the death penalty in the last five years." Jeffrey M. Jones, "Support for the Death Penalty Remains High at 74%; Slight Majority Prefers Death Penalty to Life Imprisonment as Punishment for Murder," *Gallup News Service,* May 19, 2003. Nevertheless, 74% of the respondents expressed support for the death penalty. *Id.* However, only 53% of them preferred it for convicted murderers to a sentence of life in prison without parole. *Id.*[15] 44% preferred life imprisonment. *Id.* Thus, public opinion on the question of execution or a sentence of life imprisonment without parole is now much more closely divided than it was in 1997, when 61% of the respondents favored the death penalty for convicted murderers and only 29% favored life in prison. *Id.*

There is no parole in the federal system. Convicted murderers, including Sampson, would typically be sentenced to prison for life. *See* U.S.S.G. § 2A1.1, A.N.1 ("The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for premeditated killing."). Therefore, what Gallup characterizes as a "slim majority,"

favors the death penalty when asked to express to a pollster a view which will have no actual consequences. Jones, *supra.*

In 2003, District Judge James Jones of Virginia stated that:

> After having recently spent several weeks ... individually interviewing in voir dire nearly two hundred prospective jurors on their attitudes toward the death penalty, I am convinced that our fellow citizens are largely conflicted about the death penalty. Many favor it in principle in the appropriate case, but are concerned about it in practice.

*Church,* 217 F.Supp.2d at 702–03; *see also* Kotlowitz, *supra* ("Faced with the decision to execute or not, pro-death penalty jurors are increasingly sparing lives."). There is evidence to validate Judge Jones' insight.

The decisions of juries in recent FDPA cases indicate that there is a definite disparity between attitudes toward the death penalty in principle and the willingness of federal jurors to impose it when they are fully informed about a particular case, and their decision will have real and serious consequences. The death penalty is sought only in those eligible federal cases in which the Attorney General has personally decided that it is justified. *DOJ Study* at 5, 26. Jurors who express an unyielding general unwillingness to impose the death penalty may not serve in a capital case. *See Witt, supra; Witherspoon, supra.*

Nevertheless, in sixteen of the last seventeen penalty phase verdicts returned by juries in FDPA cases the defendant has not been sentenced to death.[16] A–38, A–

---

**15.** In 2002, the Gallup Poll similarly found that 70% of the respondents expressed support for the death penalty; 52% preferred it to a sentence of life without parole; and 43% preferred a sentence of life without parole to the death penalty. A–29, Death Penalty Information Center, "Facts About the Death Penalty".

**16.** These recent verdicts raise the question of whether the Department of Justice is properly employing its stated standards in deciding to seek the death penalty. Federal prosecutors are instructed not to institute charges unless they believe that "the admissible evidence will probably be sufficient" to prove them. USAM § 9–27.220, Principles of Fed-

41, A–66 to A–67; Def.'s Supp. Mem.; Def.'s Second Supp. Mem.; Def.'s Fourth Supp. Mem. In fifteen of those sixteen cases the defendant was convicted of a crime involving murder. *Id.*[17]

As described earlier, the Supreme Court has repeatedly reiterated that the decisions of citizens as jurors are " 'a significant and reliable index of contemporary values.' " *Atkins*, 536 U.S. at 323, 122 S.Ct. 2242 (Rehnquist, C.J., dissenting) (quoting *Coker*, 433 U.S. at 596, 97 S.Ct. 2861 (plurality opinion) and *Gregg*, 428 U.S. at 181, 96 S.Ct. 2909). In finding the death sentence to be cruel and unusual punishment for rape in *Coker*, the Supreme Court "credited data showing that 'at least 9 out of 10' juries in Georgia did not impose the death sentence for rape convictions." *Id.* (quoting *Coker*, 433 U.S. at 596–97, 97 S.Ct. 2861). The statistical sample may now be too small to draw any definite conclusions from the most recent FDPA jury verdicts. However, if juries continue to reject the death penalty in the most egregious federal cases, the courts will have significant objective evidence that the ultimate sanction is not compatible with contemporary standards of decency.

However, the difficulty that citizens as jurors have had in imposing the death penalty in federal cases has not been manifested in legislative reform. As described earlier, the Governor of Illinois imposed a moratorium on executions and, in January 2003, commuted the sentence of everyone on Illinois' death row to life in prison because of the demonstrated risk that innocent individuals would be executed. A–285 to A–298. In 2002, Maryland imposed a temporary moratorium on executions in order to permit racial inequities in the capital punishment system to be investigated. A–121. That moratorium was ended when a new Governor took office. Pennsylvania is currently considering a moratorium. "Pennsylvania Panel Advises Death Penalty Moratorium," *CNN*, Mar. 4, 2003, *at* http://www.cnn.com/2003/LAW/03/04/pennsylvania.death.penalty/index.html (last visited Aug. 8, 2003).

Nevertheless, thirty-eight states and the federal government now have statutes providing for the death penalty. *Quinones*, 313 F.3d at 62 n. 11. As described earlier, the Supreme Court has characterized legislation as the "clearest and most reliable objective evidence of contemporary values . . . ." *Atkins*, 536 U.S. at 312, 122 S.Ct.

eral Prosecution. In deciding whether to seek the death penalty, the Attorney General and his colleagues "must determine whether the statutory aggravating factors applicable to the offense and any non-statutory aggravating factors sufficiently outweigh the mitigating factors applicable to the offense to justify a sentence of death." USAM § 9–10.080, Capital Crimes. In sixteen of the last seventeen cases, juries in FDPA cases have disagreed with the Department of Justice's judgment on this issue.

The Department of Justice's standards do not create litigable rights for defendants. *See Lee*, 274 F.3d at 492–93 (citing cases). However, each FDPA case necessarily involves substantial prosecutorial and judicial resources, substantial expense, and substantial burdens on citizens who must serve as jurors.

Thus, the issue of whether the Department of Justice is seeking the death penalty only in cases in which it believes that it will probably prevail is one of legitimate public interest.

**17.** The number of death sentences imposed in state cases is also diminishing. "The Bureau of Justice Statistics, in its recent capital punishment report covering the previous year (2001), indicated that the number of new death sentences in 2001 declined dramatically to 155, a nearly 50% drop from the average of 296 death sentences per year between 1994 and 2000." Death Penalty Information Center, *The Death Penalty in 2002: Year End Report* 2 (2002). This appears to be part of a trend. 319 death sentences were reportedly imposed in 1996, 229 were imposed in 2000, and 155 were imposed in 2001. Kotlowitz, *supra*, at 34.

2242 (quoting *Penry*, 492 U.S. at 331, 109 S.Ct. 2934). In *Atkins*, the Supreme Court emphasized that, after *Penry*, many states exempted the mentally retarded from execution. *Id.* at 314–16, 109 S.Ct. 2934. The direction of change was consistent. *Id.* Moreover, even the states that continued to have statutes which authorized the execution of the mentally retarded were not doing so. *Id.* at 316, 109 S.Ct. 2934. Indeed, only five mentally retarded individuals were executed after *Penry*. *Id.* Thus, there was little need to repeal the laws authorizing their execution in states in which they were not being enforced. *Id.* The Supreme Court concluded that "[t]he practice [of executing the mentally retarded], therefore, has become truly unusual, and it is fair to say that a national consensus has developed against it." *Id.*

In contrast, neither the federal government nor any state has recently repealed a death penalty statute. The lack of legislative reform seems to be inconsistent with the recent trend in jury verdicts, at least in federal cases. Perhaps this is because of what the Supreme Court has characterized as "the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime." *Id.* at 315, 109 S.Ct. 2934. Perhaps it is because citizens as voters are not wrestling with the risk of executing the innocent, or indeed the implications of executing the guilty, as jurors must.

Whatever the explanation, the objective evidence is not now sufficient to demonstrate that contemporary standards of decency have generated a national consensus that the death penalty constitutes cruel and unusual punishment because of the risk of executing the innocent.

It will, however, be incumbent on courts in future cases to monitor the reactions of legislatures and juries to the mounting evidence that death penalty statutes have resulted in death sentences and executions of innocent individuals much more often than previously understood. In 2003, bills to abolish the death penalty have been introduced in Congress and in various states legislatures. *See* Federal Death Penalty Abolition Act of 2003, S. 402, 108th Cong. (2003); H.B. 2393, 46th Leg., 1st Reg. Sess. (Ariz.2003); H.B. 213, 93rd Gen. Assem. (Ill.2003); S.B. 282, 2003 Reg. Sess. (Ind.2003); H.B. 472, 2003 Reg. Sess. (Ky.2003); S.B. 544, 2003 Reg. Sess. (Md.2003); S.B. 2139, 2003 Reg. Sess. (Miss.2003); S.B. 169, 2003 Sess. (Mo. 2003); L.B. 791, 98th Leg., 1st Sess. (Neb. 2003); S.B. 217, 72nd Sess. (Nev.2003); A. 359, 210th Leg. (N.J.2003); S.B. 651, 2003 Reg. Sess. (N.M.2003); A. 2306, 2003 Leg. Sess. (N.Y.2003); H.B. 345, 78th Reg. Sess. (Tex.2003); H.B. 1554, 2003 Sess. (Va.2003).[18] Whether such legislation is enacted will be important to future assessments of the constitutionality of the FDPA. The decisions of juries in federal and other death penalty cases will continue to be instructive as well.

The present record does not, however, include sufficient objective evidence to prove that the FDPA is unconstitutional because of the risk that innocent individuals will be executed.

---

**18.** There is also pending legislation in Massachusetts and other states to reinstate the death penalty. *See* S.B. 193, 183rd Gen. Ct. (Mass.2003); S.B. 194, 183rd Gen. Ct. (Mass. 2003); H.B. 319, 183rd Gen. Ct. (Mass.2003); H.B. 3295 183rd Gen. Ct. (Mass.2003); *see also* S.B. 1575, 2003 Reg. Sess. (Haw.2003); S.F. 338, 80th Gen. Assem., 1st Reg. Sess. (Iowa 2003).

VIII. THE FDPA DOES NOT OTHER-
WISE OPERATE IN A MAN-
NER THAT RENDERS IT UN-
CONSTITUTIONAL

■ Sampson makes three additional, related arguments that the FDPA operates in an unconstitutional manner. Sampson's first argument (Point One) relies on the fact that the death penalty is rarely imposed in federal cases. He next asserts that there is no principled way to distinguish between federal cases in which the death penalty is imposed and those in which it is not (Point Two). Finally, Sampson argues that the death penalty is sought on the invidious basis of race and on the irrational basis of geography (Point Three). Thus, Sampson argues that the imposition of the death penalty in any particular case is arbitrary and capricious, and, therefore, violates the Eighth Amendment.

It is permissible and appropriate for the court to decide these related claims prior to trial. Once again, there is a genuine case and controversy, Sampson has standing, the record concerning these claims is complete, and Sampson will suffer hardship if required to go to trial pursuant to the FDPA. *See Doe,* 323 F.3d at 138. As set forth below, however, Sampson's claims do not, individually or cumulatively, establish that the FDPA operates in an arbitrary and capricious manner.

Sampson first asserts that in *Furman* the Supreme Court found that only 15–20% of convicted murderers were sentenced to death in the jurisdictions where the death penalty was authorized. *See Furman,* 408 U.S. at 386 n. 11, 92 S.Ct. 2726 (Burger, C.J., dissenting) and 435 n.19, 92 S.Ct. 2726 (Powell, J., dissenting). Sampson asserts that the essence of the ruling in *Furman* was captured by Justice Stewart, who stated that:

These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.

*Id.* at 309–10, 92 S.Ct. 2726 (Stewart, J., concurring).

Sampson contends, without contradiction, that since the federal death penalty was reinstituted in 1988, less than 2% of the more than 1700 defendants eligible for its imposition have actually been sentenced to death. *See* A–16, A–19, Declaration of Kevin McNally, ¶ 6. Thus, he argues that the FDPA, like the statutes at issue in *Furman,* is unconstitutional.

However, the Supreme Court has explained that the decision in *Furman* was not founded on the fact that the death penalty had rarely been imposed, but rather on the fact that juries exercised unguided discretion in deciding who should live and who should die. In 1976, the Supreme Court in *Gregg* wrote that:

*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

*Gregg,* 428 U.S. at 189, 96 S.Ct. 2909.

On the same day, the Supreme Court ruled that it was essential that juries be afforded discretion in deciding whether to impose the death penalty by invalidating statutes that required its imposition for certain crimes. *See Woodson v. North Carolina,* 428 U.S. 280, 301, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts, supra.* In contrast, the statute upheld in *Gregg* was deemed valid because the procedures it established "require[d] the jury to consider

the circumstances of the crime *and the criminal* before it recommend[ed][a] sentence" and directed the jury's attention both to potentially relevant circumstances concerning the crime and potentially relevant characteristics of the person who committed it. *Gregg,* 428 U.S. at 197, 96 S.Ct. 2909 (emphasis added). These safeguards in *Gregg* were found to "further an essential need of the Anglo–American criminal justice system—to balance the desirability of a high degree of uniformity against the necessity for the exercise of discretion." *McCleskey,* 481 U.S. at 313 n. 35, 107 S.Ct. 1756.

The FDPA fully meets the requirements established in *Gregg* for guiding the discretion of the jury in a capital case. *See Gregg,* 428 U.S. at 196–98, 96 S.Ct. 2909. Indeed, Sampson does not contend that the FDPA as written is constitutionally inadequate in this respect. Because the decision in *Furman* was based on the exercise of unguided discretion by juries rather than on their infrequent imposition of the death penalty, the mere fact that the federal death penalty is often not sought and is more rarely imposed does not render it unconstitutional. *See United States v. Hammer,* 25 F.Supp.2d 518, 546–47 (M.D.Pa.1998); *O'Driscoll,* 203 F.Supp.2d at 341.

This conclusion is not altered by Sampson's claim that the brief case summaries in his appendix reveal no principled basis on which to distinguish the cases in which the federal death penalty has been sought or imposed from those in which neither has occurred. It is true, as Sampson asserts, that the Supreme Court has insisted that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

However, in *Eddings,* the Supreme Court immediately went on to explain that:

By requiring that the sentencer be permitted to focus "on the characteristics of the person who committed the crime," *Gregg,* [428 U.S. at 197, 96 S.Ct. 2909], the rule in *Lockett* [*v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] recognizes that "justice ... requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937). By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule ... recognizes that a consistency produced by ignoring individual differences is a false consistency.

*Id.* The Supreme Court reiterated this point in *McCleskey* when it wrote that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence...." *McCleskey,* 481 U.S. at 307 n. 28, 107 S.Ct. 1756.

The evidence Sampson has submitted is not sufficient to prove that truly similar capital cases result in disparate sentences. The brief case summaries on which Sampson relies lack detail and focus almost exclusively on the crime. *See* A–37 to A–72. They disclose nothing about the characteristics of the criminal except his race. *Id.* By ignoring the "individual differences" among criminals, Sampson invites the court to invalidate the FDPA because it does not produce "a false consistency" in the imposition of the death penalty. *Eddings,* 455 U.S. at 112, 102 S.Ct. 869. This is not permissible or appropriate.

Sampson could prevail in his effort to avoid being subject to the death penalty if he proved that he is being selectively subject to prosecution based on his race or for

some other constitutionally impermissible reason. *See McCleskey,* 481 U.S. at 292 n. 8, 107 S.Ct. 1756; *United States v. Lewis,* 40 F.3d 1325, 1345 (1st Cir.1994); *United States v. Bin Laden,* 126 F.Supp.2d 256, 260–61 (S.D.N.Y.2000). Sampson, however, has not asserted such a Fifth Amendment claim. *See* June 11, 2003 Tr. at 75; Def.'s Reply at 9–10. Nor is the evidence sufficient to establish a Fifth Amendment selective prosecution claim because Sampson has failed to identify a similarly situated individual for whom the federal government is not seeking the death penalty. *See Bin Laden,* 126 F.Supp.2d at 260–63.

Rather, based on the evidence in the *DOJ Study,* Sampson contends that the federal death penalty system treats cases differently based on three factors: the race of the defendant, the race of the victim, and the geographic location of the prosecution. Specifically, the defendant argues that federal prosecutors are more likely to seek the death penalty for black defendants than white defendants; are more likely to seek the death penalty in cases where the victim is white than in cases where the victim is black; and are more likely to seek the death penalty in Southern "death belt" states than in Northern states that do not have a culture of imposing the death penalty.

■ All three of these factors implicate the Eighth Amendment. None of them relate to the circumstances of the crime or the characteristics of the criminal, which are the factors that must be weighed in determining whether the death penalty is justified. If the sentences of similarly situated defendants based on these three factors were so great as to make the imposition of the death penalty arbitrary and capricious, the Eighth Amendment would be violated. The first two factors, the race of the defendant and the race of the victim, also implicate the Fifth Amendment's guarantee of equal protection of the law.[19]

Sampson's victims were white, and he is a white person being prosecuted in a Northern state. Nevertheless, as with the issue concerning the execution of the innocent discussed previously, Sampson relies on the contention that he may not be prosecuted under a law that operates in an unconstitutional manner to present arguments based on disparities relating to race of the defendant and geography. Once again, it is not necessary for the court to decide this issue because Sampson has not demonstrated that racial or regional disparities render the imposition of the death penalty pursuant to the FDPA arbitrary and capricious, or that the racial disparities prove a pattern of violations of the Fifth Amendment.

As noted earlier, Sampson bases his argument regarding racial and regional disparities on the 2000 DOJ Study of how the federal death penalty had been administered since 1988, and a 2001 supplemental report (the "Supplemental DOJ Study"). Sampson asserts that:

**19.** Any government classification that is so underinclusive or overinclusive as to be irrational implicates constitutional guarantees of equal protection. *See Burlington N.R. Co. v. Ford,* 504 U.S. 648, 653–54, 112 S.Ct. 2184, 119 L.Ed.2d 432 (1992). However, a classification based on race is subject to heightened judicial scrutiny as compared to classifications based on less suspect criteria such as geography. *See Grutter v. Bollinger,* —— U.S. ——, ——————, 123 S.Ct. 2325, 2337–38, —— L.Ed.2d —— (2003). The defendant does not suggest that geographical disparities in the administration of the federal death penalty evidence a government classification so irrational as to violate the Fifth Amendment. *See* Def.'s Brief at 50–52 (outlining Fifth Amendment argument). Such a claim would fail in any event. For the reasons described below regarding the relationship between the federal government and the states, it would be rational for the federal government to consider local attitudes regarding the death penalty in its charging decisions.

The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece. No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.

In terms of which defendant actually faced the federal death penalty, the DOJ Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants were white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%). [See, Table 1A at p. T–2 of DOJ Study.] Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study revealed a regional bias to enforcement of the federal death penalty. The DOJ study revealed the following on the issue of regional disparity:

From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution. [DOJ Study at 14.]

Twenty-two federal districts had never submitted a case for review at all. [DOJ Study at T–59.]

Twenty-one federal districts, although submitting one or more cases for re-view, had never sought permission to seek the death penalty in any case. Def.'s Brief in Support of Pretrial Motions at 37–38 (footnote omitted).

After analyzing the two DOJ studies, Professor David Baldus opined that: there is a significant risk of racial unfairness and geographic arbitrariness in the administration of the federal death penalty (A–30); U.S. Attorney charging and Department of Justice authorization rates are much higher in white-victim cases than they are in minority-victim cases (*id.*); and the practice of death-sentencing in the federal system is largely a Southern phenomenon (A–32).

The argument that the statistics disclosed in the *DOJ Study* and Supplemental Study demonstrate that the FDPA operates in an arbitrary and capricious manner was rejected in *Bin Laden*, 126 F.Supp.2d at 263, for reasons that this court finds persuasive. Among other things, the *DOJ Study* "cannot tell us the most meaningful information of all: whether individuals similarly situated ... have not been capitally-prosecuted in other federal districts." *Id.* In addition:

[F]or the aggregate statistical disparities in the DOJ [Study] even to be relevant, a preliminary assumption must be made that capital-approval rates should be approximately equal across all 94 federal districts. But this is unrealistic given inevitable differences between districts in factors such as geographic size, population, demographic composition, and criminal density. It is eminently reasonable to be of the view that some districts will of course encounter greater instances of illicit conduct meeting federal capital-eligibility criteria.

*Id.*

While the court in *Bin Laden* was addressing only the issue of geographic disparity, its observations are equally applica-

ble to Sampson's claim that alleged racial disparities relating to the administration of the FDPA violate the Eighth Amendment. For example, while the DOJ Study indicates that most inmates on death row are minorities, it does not indicate what percentage of the individuals committing death eligible offenses are minorities. *Id.* As the court in *Bin Laden* concluded:

> At most, the DOJ [Study] indicates that the 94 U.S. Attorneys in this nation exercise their capital-approval discretion unevenly. The Supreme Court declared in *McCleskey,* however, that "[a]pparent disparities ... are an inevitable part of our criminal justice system" and "where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is unexplained is invidious." (481 U.S. at 312–313, 107 S.Ct. 1756, 95 L.Ed.2d 262).

*Id.* at 263.

The statistics provided in this case do suggest that United States Attorneys exercise their discretion unevenly. For example, from 1988–2000 the United States Attorney for the District of Massachusetts requested authorization to seek the death penalty in only one of thirteen eligible cases, while the two United States Attorneys in Missouri sought authorization to seek it in each of the sixteen eligible cases in those districts. *DOJ Study* at T–15, T–19. However, the ultimate decision whether to make a prosecution a capital case is the Attorney General's. Thus, in contrast to *McCleskey,* 481 U.S. at 294–95 n. 15, 107 S.Ct. 1756, it is possible to focus on the decisions of a single federal official to determine if discretion is being exercised in a permissible manner in federal cases.

However, the ninety-four United States Attorneys still have the discretion to decide whether to initiate a federal case in which death is a potential penalty or to defer to a state prosecution in which the death penalty may not (as in Massachusetts) be authorized or, if it is authorized, may not be sought. During the period covered by the *DOJ Study,* twenty-two districts did not submit a potential case for review by the Attorney General. *DOJ Study* at T–59 to T–62. This suggests that the ninety-four United States Attorneys are still exercising unreviewed discretion that may result in a more uneven application of the federal death penalty than the *DOJ Study* indicates.

However, this does not necessarily suggest that the FDPA is being administered arbitrarily and capaciously. Rather, the apparent, and perhaps hidden, regional disparities in seeking the federal death penalty may in meaningful measure reasonably reflect cultural differences in our very large and diverse nation and an appropriate respect for those differences. Death is not a permissible penalty for murder or any other crime in Massachusetts. It is an authorized punishment under Missouri law. The historically different practices of the United States Attorneys in Massachusetts and Missouri in requesting authority to seek the federal death penalty may reflect the differing attitudes toward the death penalty embodied in the statutes of their respective states. The fact that, at least until recently, the Attorney General has respected those differences is not necessarily improper. Rather, it may indicate a reasonable appreciation for the principles that are the foundation of our federal system of government, and a recognition that while the national government has the power to seek the death penalty in a federal prosecution in a state like Massachusetts, respect for the preferences of Massachusetts citizens militates against doing so.

The Department of Justice's standards and procedures require a substantial fed-

eral interest to justify seeking the death penalty pursuant to FDPA. *See* USAM § 9–10.070. Until June 2001, the United States Attorney's Manual provided in pertinent part, that:

> Where concurrent jurisdiction exists with a State or local government, it is anticipated that a Federal indictment for an offense subject to the death penalty will be obtained only when the Federal interest in the prosecution is more substantial than the interests of the State or local authorities. *See* Principles of Federal Prosecution, USAM 9–27.000. *et seq.* *In states where the imposition of the death penalty is not authorized by law, the fact that the maximum Federal penalty is death is insufficient, standing alone, to show a more substantial interest in Federal prosecution.*

USAM § 9–10.070 (2000) (emphasis added). In June 2001, the last quoted sentence was deleted from the United States Attorney's Manual. *See* USAM § 9–10.070 (2003); *see also* Raymond Bonner, "U.S. Executes a Second Killer in a Week," *N.Y. Times,* June 20, 2001, at A12. Therefore, the fact that a state's law does not provide for the death penalty may alone now prompt the initiation of a federal capital case.

Indeed, the Attorney General has reportedly recently directed that the death penalty be sought in cases in which United States Attorneys in the North have recommended against it. *See* A–76, Benjamin Weiser & William Glaberson, "Ashcroft Pushes Executions in More Cases in New York," *N.Y. Times,* Feb. 6, 2003, at A1. In any event, the instant FDPA prosecution against a white man in the North may be part of a trend toward diminishing regional and racial disparities in seeking the federal death penalty at the expense of no longer respecting disparate regional preferences regarding the ultimate sanction.

Jurors, however, have the potential to assure that a community's deeply held values are not rendered irrelevant by decisions of the national government. It appears that potential is often realized. There has only been one FDPA prosecution in which the jury found the death penalty to be justified in a state—Michigan—that does not itself have a statute providing for the death penalty. *See* A–68 to A–70.

In any event, as indicated earlier, the Supreme Court has instructed that "[w]here the discretion that is fundamental to our criminal process is involved, [courts should not] assume that what is unexplained is invidious." *McCleskey,* 481 U.S. at 313, 107 S.Ct. 1756. Sampson, however, challenges the government to explain what he characterizes as regional and racial disparities in the operation of the FDPA. This is, in effect, a request for discovery.

In the context of a Fifth Amendment selective prosecution claim, the Supreme Court has recently held that "a defendant who seeks discovery . . . must show some evidence of both discriminatory effect and discriminatory intent," and that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*" *United States v. Bass,* 536 U.S. 862, 863, 864, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002). This court concludes that a comparable showing is required to obtain discovery concerning Sampson's related Eighth Amendment claim. That showing has not been made.

Thus, Sampson's claim that the FDPA operates in a manner that is arbitrary and capricious must be decided on the current record. For the reasons described previously, Sampson's three related arguments that the FDPA operates in a way that is arbitrary and capricious and is, therefore, cruel and unusual in violation of the Eighth Amendment are not, individually or

cumulatively, convincing. *See Bin Laden,* 126 F.Supp.2d. at 263.

Nor has Sampson demonstrated a violation of the Fifth Amendment based on racial disparities in the administration of the federal death penalty.‵ The First Circuit has held that:

> A selective prosecution claim fails unless the defendant establishes that his prosecution results from "intentional and purposeful discrimination." *United States v. Bassford,* 812 F.2d 16, 19 (1st Cir.), *cert. denied,* 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987). This requires that the defendant demonstrate, "at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or based in bad faith, i.e., based upon such impermissible considerations as race...." *Id.* (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974)).

*Lewis,* 40 F.3d at 1345; *accord McCleskey,* 481 U.S. at 292, 107 S.Ct. 1756 ("[A] defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination.") (internal quotation marks and citation omitted).

While Sampson's Fifth Amendment claim relies on the alleged violation of the rights of others, he fails to identify any particular person for whom the federal government sought the death penalty while not seeking that sanction for another similarly situated individual. Sampson's statistical evidence is insufficient to establish the necessary discriminatory effect. *See Bin Laden,* 126 F.Supp.2d at 261–62.

It is also not adequate to prove purposeful discrimination. In· *McCleskey,* the Su-preme Court rejected the use of statistics to demonstrate purposeful discrimination in the context of a challenge to the death penalty. *McCleskey,* 481 U.S. at 293–98, 107 S.Ct. 1756. As the court wrote in *Bin Laden,* 126 F.Supp.2d at 261, "[a]t its core, [ ] *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant."

Sampson attempts to distinguish *McCleskey,* arguing that unlike the large number of decision-makers at issue in *McCleskey,* in this case all of the authorization decisions at issue were made by the Attorney General. The· defendant further notes that a single Attorney General, Janet Reno, personally approved over 80% of federal death penalty prosecutions initiated after 1988. Def.'s Brief at 60 n. 33. The court in *Bin Laden* recognized this distinction:

> *McCleskey* is silent on whether an *individualized* statistical study should be treated as skeptically as a systemic one. It is not entirely clear, after all, that racially disproportionate figures with respect to a single prosecutor's capital-charging decisions should not afford a more legitimate basis for an inference of discriminatory intent. (*See generally* John H. Blume, Theodore Eisenberg & Sheri Lynn Johnson, "Post-*McCleskey* Racial Discrimination Claims in Capital Cases," 83 *Cornell L.Rev.* 1771 (Sept. 1998).) This practical distinction is at issue here because the DOJ Survey offers both systemic and individualized figures.

*Bin Laden,* 126 F.Supp.2d at 261. Ultimately, the court in *Bin Laden* determined that it "need not rule ... on the relationship in death penalty cases between individualized statistical evidence and proof of discriminatory intent" because the defen-

dants failed to establish discriminatory effect. *Id.*

However, the difficulty of using a systemic study to establish purposeful discrimination by various individuals was only one reason that the Supreme Court rejected the use of statistics to demonstrate discriminatory intent in *McCleskey*, 481 U.S. at 294–97, 107 S.Ct. 1756. The Court also refused to permit McCleskey to use statistical evidence to prove purposeful discrimination because of: the "innumerable" factors that enter into decisions in a death penalty case, "the impropriety of [ ] requiring prosecutors to defend their decisions to seek death penalties, often years after they were made," and the need for discretion in the criminal justice process. *Id.* at 294, 296–97, 107 S.Ct. 1756 (internal quotation marks omitted). In light of these considerations, the statistics proffered by the defendant are insufficient to establish purposeful discrimination by the Attorney General. Accordingly, Sampson's Fifth Amendment claim that the FDPA discriminates based on race is not proven.

IX. SAMPSON'S CLAIM THAT THE FDPA IS UNCONSTITUTIONAL FOR THE REASONS DESCRIBED IN *FELL* IS NOT YET RIPE FOR DECISION

■ Sampson contends that because 18 U.S.C. § 3593(c) authorizes the use of information at sentencing that would not be admissible under the Federal Rules of Evidence, the FDPA violates his Fifth and Sixth Amendment rights. This claim was found to be meritorious in *Fell*, 217 F.Supp.2d at 485–90, but has been rejected in other cases. *See, e.g., United States v. Haynes*, 269 F.Supp.2d 970, 984–85, 2003 WL 21537282, at *12–13 (W.D.Tenn.2003); *United States v. Matthews*, 246 F.Supp.2d 137, 141–46 (N.D.N.Y.2002); *United States v. Lentz*, 225 F.Supp.2d 672, 682–84 (E.D.Va.2002); *United States v. Regan*, 221 F.Supp.2d 672, 681–83 (E.D.Va.2002).

This issue is not ripe for resolution in the instant case because the relevant record is not complete.

This court explained previously its tentative view on this issue. *See Sampson*, 245 F.Supp.2d at 338–39. It is still not clear whether the government will offer, and the court will admit under § 3593(c), any evidence against Sampson that would not be admissible pursuant to the Federal Rules of Evidence. *Id.* at 339.

Moreover, § 3593(c) may prove to be more favorable to Sampson than the Federal Rules of Evidence. It may allow him to present to the jury information concerning mitigating factors that would ordinarily be inadmissible. In addition:

> Section 3593(c) provides that at the penalty phase of the trial, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." This balancing test is more favorable to the defendant than the test established by Federal Rule of Evidence 403, which requires that to exclude otherwise admissible evidence a court find that its probative value is *substantially* outweighed by such dangers. *See* Fed R. Evid. 403; *Regan*, 221 F.Supp.2d at 682.

*Id.* (emphasis added).

The Supreme Court held in *Gregg*, 428 U.S. at 204, 96 S.Ct. 2909, that "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision." In *Ring*, 536 U.S. at 609, 122 S.Ct. 2428, the Supreme Court reversed its prior precedent and deemed the factors that subject a defendant to a possible death sentence to be the functional equivalents of elements of the offense. This ruling may render inad-

missible some information that previously could have been presented to a jury in the penalty phase of a capital case. *See Sampson,* 245 F.Supp.2d at 339. However, this case is still not in a posture where that question can be resolved.

The court will evaluate the government's proffered penalty phase evidence in the context of Sampson's claim that § 3593(c) violates his constitutional rights. If the court decides that the government should be allowed to introduce evidence that would be inadmissible pursuant to the Federal Rules of Evidence, Sampson's claim based on *Fell* will be ripe for resolution.

## X. SAMPSON'S CLAIM THAT THE FDPA IS UNCONSTITUTIONAL AFTER *RING* IS INCORRECT

Sampson reiterates his claim that *Ring* renders the FDPA unconstitutional because the statute does not expressly require that the factors which subject a defendant to the possible imposition of the death penalty be alleged in the indictment. The court previously considered and rejected this contention. *See Sampson,* 245 F.Supp.2d at 330–38. For the reasons explained previously, Sampson's claim remains unmeritorious. *Id.*

## XI. SAMPSON'S CLAIMS REGARDING APPELLATE REVIEW ARE NOT ALL RIPE FOR RESOLUTION

■ Sampson asserts that the FDPA does not authorize appellate review for plain error (Point Twelve) or review of whether the death sentence imposed on the appellant is proportional to the sentences imposed on other, similarly situated individuals (Point Eleven). He argues that the FDPA is, therefore, unconstitutional. Many lower courts have rejected these arguments. *See Bin Laden,* 126 F.Supp.2d at 297 nn. 10, 12 (citing cases). As the government has acknowledged,

however, the Supreme Court has not decided all of the issues Sampson presents. *See* June 11, 2003 Tr. at 144.

This court finds that the issues concerning the constitutional adequacy of the appellate review provided by the FDPA are not all ripe for resolution. If Sampson is convicted and is sentenced to death, the First Circuit will decide the scope of its review. *See Llera Plaza,* 179 F.Supp.2d at 457 ("Determining the proper scope of appellate review is, of course, a matter to be determined by a court of appeals, not by a district court."). Only then will the facts be sufficiently clear to permit a decision on Sampson's claim that the FDPA does not provide for constitutionally adequate appellate review. It is most appropriate that the First Circuit decide the merits of that claim. *Id.; Cuff,* 38 F.Supp.2d at 286.

More specifically, Sampson asserts that the FDPA provides, in part, that "whenever the court of appeals finds that . . . the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*" it shall remand the case. 18 U.S.C. § 3595(c)(2)(C) (emphasis added). Sampson contends that the statute, therefore, deprives the courts of appeals in FDPA cases of their usual power to review and reverse or remand for plain error, as to which there was no objection at trial. *See* Fed. R. Crim P. 52(b); *United States v. Olano,* 507 U.S. 725, 731–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Frady,* 456 U.S. 152, 163 n. 13, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

However, the Supreme Court has addressed § 3595(c)(2)(C) and stated that "[t]he statute does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *Jones v. United States,* 527 U.S.

373, 388–89, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). The Court then went on to review the jury instructions at issue for plain error. *Id.* at 389, 119 S.Ct. 2090. Thus, Sampson's claim that the FDPA violates his right to equal protection by prohibiting plain error review is without merit.

Sampson's argument regarding proportionality review is not ripe for resolution. The proportionality review Sampson claims is not provided by the FDPA:

> presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

*Pulley v. Harris,* 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

The FDPA does not expressly provide for proportionality review. In *Pulley* the Supreme Court stated that while in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) it had "emphasiz[ed] the importance of mandatory appellate review under the Georgia statute, [it] did not hold that without comparative proportionality review the statute would be unconstitutional." *Id.* at 50, 104 S.Ct. 871 (internal citations omitted). The Court added that "[t]here is [ ] no basis in [its] cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it." *Id.* at 50–51, 104 S.Ct. 871.

*Pulley* did not involve a statute which, like the FDPA, permits the use of non-statutory aggravating factors and a weighing of aggravating and mitigating factors to determine whether a death sentence is justified. *See Pulley,* 465 U.S. at 51–54, 104 S.Ct. 871. Thus, as the government has acknowledged, *see* June 11, 2003 Tr. at

144, neither the Supreme Court nor the First Circuit has decided the issue Sampson presents.

However, the FDPA does not prohibit the courts of appeals from performing a proportionality review of a death sentence. The Florida Supreme Court performs proportionality review despite the fact that the Florida statutes authorizing capital punishment do not provide for it. *See Tillman v. State,* 591 So.2d 167, 168–69 (Fla.1991). The Supreme Courts of Arizona and Arkansas did the same, despite a lack of statutory authority, prior to *Pulley. See* Penny J. White, "Can Lightning Strike Twice? Obligations of State Courts after *Pulley v. Harris,*" 70 *U. Colo. L.Rev.* 813, 845–48 (1999). These examples suggest that the First Circuit may conduct a proportionality review if Sampson is sentenced to death.

Such review would not involve a constitutionally impermissible rewriting of the statute. Just as the FDPA neither explicitly forbids nor requires that an indictment allege at least one statutory aggravating factor, the FDPA neither forbids nor requires proportionality review. This court has previously found that *Ring, supra,* did not render the FDPA unconstitutional in part because "there is nothing in the [statute] that expresses Congressional intent to prohibit the grand jury from performing its traditional function under the Fifth Amendment following *Ring.*" *Sampson,* 245 F.Supp.2d at 336. The same analysis and conclusion apply to Sampson's claim concerning proportionality review.

Sampson's claim that the FDPA is unconstitutional because it does not provide for proportionality review is, therefore, not ripe for resolution because the relevant facts regarding the scope of review are not yet established. *See Doe,* 323 F.3d at 138. As the First Circuit has written, "[d]eciding constitutional questions in the abstract

is a recipe for making bad law." *United States v. Hilton,* 167 F.3d 61, 71 (1st Cir. 1999), *abrogated on other grounds by, Free Speech Coalition, supra.* The court will not do so with regard to Sampson's claim that the FDPA fails to provide for constitutionally required proportionality review.

## XII. SAMPSON'S CHALLENGES TO THE NON–STATUTORY AGGRAVATING FACTORS ARE EITHER NOT RIPE OR ARE WITHOUT MERIT

Sampson raises several challenges to the non-statutory aggravating factors that the government alleges in its Notice of Intent to Seek the Death Penalty. He argues that: they are not authorized by the FDPA (Point Seven); if authorized, they represent an unconstitutional delegation of legislative authority (Point Ten); they may not include unadjudicated criminal conduct (Point Nine); and some of them are unconstitutionally vague, duplicative or irrelevant (Point Eight). Some of these claims are ripe for decision now, but others are not.

■■ Sampson's arguments that the FDPA does not authorize the government to allege non-statutory factors and that, if it does, the FDPA violates the constitutional prohibition on the delegation of legislative power to the executive branch are ripe for adjudication. Both arguments can be resolved based on the text of the statute. Sampson's claim that unadjudicated criminal conduct can never properly be a non-statutory aggravating factor is also ripe for decision because it does not depend on the particular unadjudicated crimes that the government alleges in this case. In contrast, the arguments relating to specific aggravating factors are, in large part, not yet ripe for decision. In order to best evaluate the relevance, reliability, probative value and danger of unfair prejudice associated with the non-statutory ag-

gravating factors that Sampson attacks, the court must wait until it has additional information about them.

## A. THE FDPA AUTHORIZES THE GOVERNMENT TO ALLEGE NON–STATUTORY AGGRAVATING FACTORS

■■ Sampson contends that the FDPA does not authorize the government to allege non-statutory aggravating factors, with the exception of victim impact evidence. According to Sampson:

This is so because § 3592(c) of the statute contradicts § 3591(a) of the statute. The former provides that the jury "may consider whether any other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c). But § 3591(a) provides that a defendant may be sentenced to death only after a consideration by the jury of "the factors set forth in § 3592 . . . ." Section 3592 contains . . . a listing of 16 factors and 16 factors only. Therefore, non-statutory factors may not be considered by a jury since they are not—and could not be—set out in § 3592.

Def.'s Brief at 77 (footnote omitted).

This argument is not persuasive. *See Llera Plaza,* 179 F.Supp.2d at 457–59. Rather, the FDPA provides that in deciding whether the death penalty is justified, the jury must consider the statutory aggravating factors set forth in § 3592 and may also consider any proven non-statutory aggravating factors. More specifically, as explained in *Llera Plaza:*

Close scrutiny of the FDPA's text reveals that the problem of parsing §§ 3591(a) and 3592(c) is somewhat more complex than the defendants' argument—and the refutation of a cognate argument in [*United States v.*] *Nguyen* [, 928 F.Supp. 1525 (D.Kan.1996) ]—would suggest. To understand the quot-

98

ed statutory provisions, reference must be made to the entire fabric of the FDPA.

Other sections of the FDPA confirm that the phrase "the factors set forth in section 3592," as used in § 3591(a), should be interpreted to include only statutory aggravating factors. For example, elsewhere in the statute, the sentencer is directed to "return special findings identifying any *aggravating factor or factors set forth in section 3592* found to exist and any *other aggravating factor for which notice has been provided* under subsection (a) found to exist." § 3593(d) (emphasis added). In this context, it is clear that the phrase "factor or factors set forth in section 3592" refers only to statutory aggravating factors, since it is explicitly distinguished from the phrase "any other aggravating factor for which notice has been provided," referring to non-statutory aggravating factors. In addition, the FDPA also mandates that "[i]f no *aggravating factor set forth in section 3592* is found to exist, the court shall impose a sentence other than death authorized by law." § 3593(d) (emphasis added). Here again, the phrase "factor set forth in section 3592" clearly refers only to statutory aggravating factors; the FDPA is uniformly understood to preclude the sentencer from imposing the death penalty if it has not found, beyond a reasonable doubt, that at least one statutory aggravating factor exists. *See, e.g., Allen,* 247 F.3d at 758; *Cooper,* 91 F.Supp.2d. at 95.

Consistency therefore demands that in reading § 3591(a), the phrase "the factors set forth in section 3592" must be taken to comprehend only statutory aggravating factors. However, this is not to say that the defendants are correct that § 3591(a) undermines the government's authority, under the catch-all sentence of § 3592(c), to articulate and attempt to establish non-statutory aggravating factors. To reiterate, § 3591(a) authorizes the sentencer to impose the death penalty if it finds such a sentence justified "after consideration of the factors set forth in section 3592." Section 3591(a) thus affirmatively directs the sentencer to include statutory factors in its calculus; however, it does not prohibit the sentencer from including non-statutory aggravating factors as well—or, for that matter, mitigating factors. Simply because consideration of one type of factor is mandated does not mean that consideration of other types of factors is precluded.

To construe § 3591(a) so narrowly as to nullify the catch-all sentence of § 3592(c) authorizing the use of non-statutory aggravating factors would violate "the longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous." *Beck v. Prupis,* 529 U.S. 494, 506, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000); *see also United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955). The defendants' argument does not, therefore, present a compelling challenge to the government's authority to articulate non-statutory aggravating factors under the FDPA.

*Id.* at 458–59.

B. THE POWER TO ALLEGE NON-STATUTORY AGGRAVATING FACTORS IS NOT A DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE BRANCH

Sampson argues that by allowing the Department of Justice to define non-statutory aggravating factors, Congress has violated the constitutional prohibition on the delegation of legislative power to

the executive branch. *See generally Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472–76, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The government responds that "[t]he argument fails because the FD[P]A is not a delegation of legislative authority at all" and "[e]ven if the FD[P]A's provision for the presentation of non-statutory aggravating factors were held to involve a delegation of legislative authority to the Executive Branch, that delegation is not improper." Gov.'s Consol. Resp. at 69–70.

The government's response incorporates a dichotomy that has appeared in various delegation cases. However, as Justice Scalia has written:

> While it has become the practice in [the Supreme Court's] opinions to refer to "unconstitutional delegations of legislative authority" versus "lawful delegations of legislative authority," in fact the latter category does not exist. Legislative power is nondelegable.

*Loving v. United States*, 517 U.S. 748, 776–77, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (Scalia, J., concurring in part and concurring in the judgment). This principle appears to have been adopted by the majority of the Supreme Court in *Whitman*, 531 U.S. at 472, 121 S.Ct. 903, over the objections of Justices Stevens and Souter. *Id.* at 488, 121 S.Ct. 903 (Stevens, J. and Souter, J., concurring in part and concurring in the judgment). Thus, the question, properly framed, is not whether there has been an "unlawful" delegation of legislative power, but whether there has been any delegation of legislative power at all.

When a prosecutor exercises the power provided by the FDPA to identify non-statutory aggravating factors, and incorporates them in an indictment returned by a grand jury, he is performing an executive function rather than exercising legislative power. Consequently, the FDPA does not involve a delegation of legislative power to the executive branch.

This conclusion is rooted in the role of non-statutory aggravating factors in the process established by the FDPA for determining whether the death penalty should be imposed. There are, as a practical matter, three stages to a federal death penalty case. The first stage determines whether guilt has been proven. In this case, the government must prove, beyond a reasonable doubt, that Sampson committed a carjacking resulting in death within the meaning of 18 U.S.C. § 2119(3). If Sampson is found guilty, in the second stage the jury decides whether he is eligible for the death penalty. In the eligibility stage, the government must prove, beyond a reasonable doubt, one of the four mental states delineated in 18 U.S.C. § 3591(a)(2) and at least one of the sixteen statutory aggravating factors set forth in 18 U.S.C. § 3592(c). If the defendant is found to be eligible for execution, in the third stage the jury decides whether to select the death penalty as the punishment for his crime. It is in this stage, when the jury determines whether a sentence of death is justified for an eligible defendant, that non-statutory aggravating factors enter into the jury's deliberations.

The latter two stages, eligibility and selection, are essential to any constitutional scheme of capital punishment. As the Supreme Court has stated:

> [S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage

is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime. *Zant,* 462 U.S. at 878–79, 103 S.Ct. 2733 (footnote omitted) (emphasis in original).

Determining the criteria that define who is eligible for a sentence of death, by defining the substantive crime and the additional factors that make a person who commits that crime eligible for the death penalty, is a legislative function. Congress may not delegate to the executive branch the authority to enlarge the class of people who are eligible for a federal death sentence, by allowing the Executive to either define new substantive crimes or to add to the gateway mental states and statutory aggravating factors set forth in the FDPA. The FDPA does not, however, do this.

Unlike statutory aggravating factors, non-statutory aggravating factors relate solely to the individualized determination of whether a death sentence is justified for a person who has, based on proven statutory factors, been found eligible for execution. The finding of a non-statutory aggravating factor is neither a necessary nor sufficient prerequisite to imposing a death sentence. The contrast between statutory aggravating factors and non-statutory aggravating factors is even clearer in light of *Ring, supra.* The statutory aggravating factors have now been deemed to be the functional equivalents of offense elements and, therefore, must be charged in an indictment. *See Ring,* 536 U.S. at 609, 122 S.Ct. 2428; *Sampson,* 245 F.Supp.2d at 332–33. However, "[b]ecause a finding of nonstatutory aggravating factors does not 'increase[ ] the penalty for a crime beyond the prescribed statutory maximum,' [*Apprendi v. New Jersey,* 530 U.S. 466, 486, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ] they need not be alleged in the indictment." *U.S. v. Davis,* No. CR.A.01–282, 2003 WL 1873088, at *2 (E.D.La. 2003).

Thus, in alleging a non-statutory aggravating factor, the prosecutor is not "making law" by creating any substantive obligation, criminalizing any conduct, or increasing the maximum penalty to which a particular defendant is exposed. Instead, the prosecutor is engaging in an act of advocacy. *See United States v. Pitera,* 795 F.Supp. 546, 560–61 (E.D.N.Y.1992).

In a non-capital case, the relevant statute provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, in such cases the parties at sentencing regularly present information concerning what are, in effect, relevant non-statutory aggravating and mitigating factors. *See* Fed.R.Crim.P. 32(i). The Department of Justice, "in engaging in such advocacy, exercises discretion derived from the executive's enforcement powers, not from any delegated legislative powers." *Pitera,* 795 F.Supp. at 561. It is exercising the President's power to "take Care that the Laws be faithfully executed..." U.S. Const. Art. II, § 3.

These principles are equally applicable in a capital case. Indeed, death is the one sentence legislatures cannot make mandatory. *See Woodson,* 428 U.S. at 303–05, 96 S.Ct. 2978. The defendant has constitutional and statutory rights to present evidence of relevant mitigating factors to a sentencing jury in a capital case. *See McCleskey,* 481 U.S. at 305–06, 107 S.Ct. 1756; *Pitera,* 795 F.Supp. at 561. The Department of Justice has at least a related statutory right to argue that relevant aggravating factors justify imposition of the death penalty. In presenting evidence and arguments concerning the propriety of

the death penalty in a particular case, the government is not exercising the legislative power to define who is eligible for execution. Rather, the Department of Justice is performing the Executive's traditional function of seeking to persuade the court, which in a capital case acts with and through the jury, that the sentence that it advocates is the most appropriate sanction.

The FDPA provides a structure for this advocacy. The government must give the defendant notice of the non-statutory aggravating factors it proposes to prove. See 18 U.S.C. § 3593(a). The statute further provides that those non-statutory aggravating factors must be "relevant." Id. "[A]s pertains to the identification of factors intended to give guidance in making the decision whether to impose a death sentence or life imprisonment, relevance means relevance to the issue: who should live or die." United States v. Friend, 92 F.Supp.2d 534, 543 (E.D.Va.2000); see also Gregg, 428 U.S. at 192, 96 S.Ct. 2909 (stating that the unguided discretion found unconstitutional in Furman "will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems *particularly relevant* to the sentencing decision.") (emphasis added).

Once the government gives notice of what it proposes to prove and argue as justification for a death sentence, the judge serves as a gatekeeper. Before admitting evidence of a non-statutory aggravating factor, the judge must find that it is sufficiently relevant, that the evidence supporting it is sufficiently reliable, and that the probative value of the evidence is not "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); see also United States v. Jones, 132 F.3d 232, 239–40 (5th Cir.1998), aff'd, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370

(1999). After the judge performs this gatekeeping function, the jury considers any proven non-statutory aggravating and mitigating factors along with any proven statutory aggravating and mitigating factors in deciding whether the death sentence is justified. See 18 U.S.C. § 3593(e).

Thus, under the FDPA, the sentencing function is one that is shared among the legislature, the prosecution, the court and the jury. Shared responsibility for sentencing decisions is not unique to the FDPA. "Historically, federal sentencing— the function of determining the scope and extent of punishment—never has been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government." Mistretta v. United States, 488 U.S. 361, 364, 390, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Indeed, all three branches play an important role in the typical sentencing decision. Congress sets maximum sentences for crimes and, in some cases, mandatory minimum sentences as well. The United States Sentencing Commission promulgates Guidelines that limit a judge's discretion. See 28 U.S.C. § 991; 18 U.S.C. § 3553(b). The prosecutor chooses which aggravating factors, if any, to advocate in arguing for a particular sentence within a Guideline range or in seeking an upward departure. In a non-capital case, the court decides the most appropriate, lawful sentence.

Since non-statutory aggravating factors are used only in the exercise of the Executive's power to advocate a particular sentence, Congress has not in the FDPA delegated any of its legislative power. Consequently, it does not matter whether Congress has articulated an intelligible principle to guide the Attorney General's discretion in alleging non-statutory aggravating factors. The "intelligible principle" test is only implicated in cases where

Congress delegates rulemaking authority to the Executive. As the Second Circuit has stated, the "[e]xercise of ... prosecutorial discretion involves no rulemaking power on the part of the Executive Branch and, therefore, cannot constitute a delegation of legislative power to the Attorney General—let alone an unlawful delegation of such power." *United States v. Yousef,* 327 F.3d 56, 116 (2d Cir.2003).

Therefore, Sampson's claim that the FDPA involves an unconstitutional delegation of legislative power is not meritorious.

### C. UNADJUDICATED CRIMINAL CONDUCT MAY BE CONSIDERED AS A NON–STATUTORY AGGRAVATING FACTOR

■ Sampson asserts that alleged criminal conduct of which he has not been previously convicted may not, as a matter of law, be presented to the jury as a nonstatutory aggravating factor (Point Nine). He relies, in part, on the contention that a jury which has already found a defendant guilty of a capital offense cannot fairly decide if he previously committed other crimes. If the court is not persuaded that evidence of alleged, unadjudicated criminal conduct is categorically inadmissible, Sampson requests that the court require that the government specify before trial the unadjudicated criminal conduct it proposes to prove and carefully evaluate the reliability of the government's evidence before authorizing its admission.

Several state courts have found the arguments Sampson presents to be persuasive. *See Cook v. State,* 369 So.2d 1251, 1257 (Ala.1978); *State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276, 278 (1979); *State v. Bobo,* 727 S.W.2d 945, 955 (Tenn.1987); *State v. Bartholomew,* 101 Wash.2d 631, 683 P.2d 1079, 1086 (1984) (reaffirming holding of prior decision at 98 Wash.2d 173, 654 P.2d 1170 regarding unadjudicated criminal conduct after Supreme Court

vacated prior decision). However, as Judge Ponsor wrote in rejecting a comparable claim in *Gilbert:*

The overwhelming majority of federal courts has held that neither the Eighth Amendment nor the due process clause impose a *per se* barrier to the use of unadjudicated criminal conduct in capital sentencing. *See, e.g., Hatch v. State,* 58 F.3d 1447, 1465 (10th Cir.1995) (upholding use of prior unadjudicated conduct from due process challenge), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); *United States v. Cooper,* 91 F.Supp.2d 90, 106–107 (D.D.C.2000) *and cases cited* (allowing evidence of uncharged racketeering offenses, robbery, shootings and handgun offenses); *United States v. Davis,* 912 F.Supp. at 949 (allowing prior misconduct as long as its use does not violate other safeguards). Indeed, in a pre-*Furman* case, the Supreme Court held that a judge's consideration of unadjudicated crimes in sentencing a defendant to death did not violate the due process clause. *See Williams v. New York,* 337 U.S. 241, 244, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), *discussed in Hatch,* 58 F.3d at 1465. Although the landscape of federal death penalty jurisprudence has changed substantially since 1949, nothing in the Court's subsequent jurisprudence has disturbed the core ruling in this case. *See Nichols v. United States,* 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (citing holding of *Williams* with approval)....

\* \* \* \* \* \*

[E]ven if this court were not bound by precedent, defendant's arguments against admission are outweighed by the simple fact that evidence of other acts of violence by a defendant "is arguably more relevant and probative than any other type of aggravating evidence sup-

porting imposition of the death penalty." *Davis*, 912 F.Supp. at 948. For the court to impose a *per se* ban on such evidence would give juries a far more positive view of many capital defendants than is true and accurate. This would detract from the reliability of capital sentencing, because the more information juries have about offenders, the more reliable and predictable their determinations will be. *See United States v. Beckford*, 964 F.Supp. 993, 997–98 (E.D.Va.1997).

*Gilbert*, 120 F.Supp.2d at 151–52 (footnote omitted) (emphasis in original).

This court finds the reasoning in *Gilbert* persuasive. It is, therefore, not categorically unconstitutional to permit the presentation of evidence of unadjudicated criminal conduct in the penalty phase of a capital case.

The court has, however, ordered the government to produce prior to trial the evidence of such conduct that it will seek to admit. Before ruling on its admissibility, the court will conduct a hearing to determine whether the alleged crimes are relevant to deciding the issue of which murderers should live and which should die. *See Zant*, 462 U.S. at 876–77, 103 S.Ct. 2733. This court does not anticipate having to decide whether the evidence proffered is sufficiently reliable to be considered because Sampson admits committing the other crimes and, at this point, only asserts that they do not constitute discrete, non-statutory aggravating factors.

## D. ISSUES RELATING TO SPECIFIC FACTORS

The defendant attacks seven of the aggravating factors alleged by the government in its Notice of Intent to Seek the Death Penalty. He argues that:

(a) The statutory aggravating factor alleging that each homicide was committed "in an especially heinous, cruel, and depraved manner" lacks factual support, is unconstitutionally vague and should be stricken;

(b) The statutory aggravating factor alleging that each homicide was committed after "substantial planning and premeditation" is unconstitutionally vague and should be stricken;

(c) The statutory aggravating factor alleging (as to Mr. McCloskey only) "vulnerability of victim" is unconstitutionally vague and should be stricken;

(d) The non-statutory aggravating factor alleging the carjacking of William Gregory is not constitutionally relevant and should be stricken;

(e) The non-statutory aggravating factor alleging five armed bank robberies in North Carolina is not constitutionally relevant and should be stricken;

(f) The non-statutory aggravating factors alleging "contemporaneous convictions for more than one murder" and the murder of Robert Whitney are alleged in a duplicative manner and should be stricken or limited in use;

(g) The non-statutory aggravating factor "future dangerousness" is unconstitutionally vague and duplicative of other allegations in the notice of aggravating factors.

Def.'s Brief at 78–79.

With regard to the statutory aggravating factor alleging that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim," the court lacks sufficient information to address the defendant's claim that this factor lacks factual support. However, the defendant's claim that this factor is unconstitutionally vague is ripe for decision and incorrect.

■ The Supreme Court has written that " 'the proper degree of definition' of eligibility and selection factors often 'is not susceptible of mathematical precision...' " *Tuilaepa v. California*, 512 U.S. 967, 973, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (quoting *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). "[A] factor is not unconstitutional if it has some 'common-sense core of meaning ... that criminal juries should be capable of understanding.' " *Id.* (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)). This court, like every other court to have considered this challenge to the FDPA, finds that this standard is met by the alleged aggravating factor that the crime was committed "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6); *see Matthews*, 246 F.Supp.2d at 148–49 (citing cases); 1 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions*, Inst. 9A–11 cmt., at 9A–46 ("Courts have unanimously denied these [vagueness and overbreadth] challenges.").

■ Sampson's vagueness challenge to the aggravating factor alleging that "[t]he defendant committed the offense after substantial planning and premeditation to cause the death of a person" is also without merit. This challenge too has, for good reason, been "uniformly rejected" by other courts. 1 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions*, Inst. 9A–13 cmt., at 9A–53; *see Bin Laden*, 126 F.Supp.2d at 296 n. 7 (citing cases).

■ The aggravating factor alleging that McCloskey "was particularly vulnerable due to old age and infirmity" also is not unconstitutionally vague. The defendant and the government acknowledge that courts have instructed juries that this factor requires a nexus between the victim's vulnerability and the offense. *Compare* Def.'s Brief at 87 *with* Gov.'s Consol. Resp. at 50. However, Sampson argues that a nexus requirement is insufficient. Sampson contends that the court should also instruct the jury that the government must prove that the defendant "(1) was aware of the victim's vulnerability and (2) specifically targeted his victim because of that vulnerability" because otherwise a defendant could become eligible for a death sentence as a result of "circumstances that the defendant was unaware of and which played no role in the capital offense beyond mere happenstance." Def.'s Brief at 88. Thus, it appears that the defendant is not really arguing that this aggravating factor is unconstitutionally vague, but rather that the court should craft a jury instruction that appropriately limits its scope. The court will decide this issue in the context of resolving other disputes concerning the parties' proposed jury instructions. However, any argument that, even when limited by an appropriate nexus requirement, the factor that a victim was particularly vulnerable because of old age and infirmity lacks a "common-sense core of meaning ... that criminal juries should be capable of understanding," is without merit.

Sampson next argues that the non-statutory aggravating factors alleging the carjacking of Gregory and five armed bank robberies are not sufficiently relevant to the issue of whether he should live or die to be admissible. The court has received a proffer from the government detailing the evidence it intends to introduce to prove these statutory aggravating factors. The defendant agrees that: (1) the government has enough reliable evidence to persuade a jury, beyond a reasonable doubt, that Sampson committed the Gregory carjacking and each of the five bank robberies; and (2) the jury should hear some evidence of these events in order to place evidence of other aggravating and mitigating factors in context. *See* June 11, 2003 Tr. at 106–

09; Def.'s Mem. Opposing Utilization of Vt. Carjacking & N.C. Bank Robberies as Aggravating Factors at 2. Thus, the remaining dispute is essentially whether the jurors should be permitted to consider the Gregory carjacking and the five bank robberies as distinct aggravating factors.[20]

The court is not now deciding these questions. Although the government's proffer is complete, no hearing has yet been held concerning it. Moreover, the parties dispute whether certain evidence that the government seeks to introduce to prove the bank robberies and Gregory carjacking is admissible under 18 U.S.C. § 3593(c). The admissibility of the proffered evidence may be influenced by whether the unadjudicated crimes that the government seeks to prove are to be presented as discrete, non-statutory aggravating factors or merely part of the background information that the jury will hear.

■ More specifically, the court is concerned that the bank robberies may lack sufficient gravity to be deemed relevant to the issue of whether Sampson should be executed for the murders he admits committing. "As the Supreme Court has held, aggravating factors in death penalty cases must be '*particularly* relevant to the sentencing decision,' not merely relevant, in some generalized sense, to whether defendant might be considered a bad person.' *Gregg*, 428 U.S. at 192, 96 S.Ct. 2909, 49 L.Ed.2d 859 (emphasis added)." *Gilbert*, 120 F.Supp.2d at 150–51. Although the court has no doubt that the bank robberies are serious crimes, there is a question as to whether they "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. 2733. A proper resolution of this issue will be facilitated by further argu-

ment in the context of the actual evidence the government proposes to present.

The following observations may be helpful to that argument. The government contends that it should be permitted to present the bank robberies as independent, non-statutory aggravating factors because they are as serious or more serious than the crimes Congress identified as statutory aggravating factors in 18 U.S.C. § 3592. *See* June 11, 2003 Tr. at 112–14. However, the statutory aggravating factors set forth by Congress are limited to crimes for which there was a prior conviction. Although, as explained earlier, the government is not categorically prohibited from alleging unadjudicated criminal conduct as a non-statutory aggravating factor, unadjudicated crimes are different from convictions in an important respect. For the purpose of determining an appropriate sentence, the fact that a defendant has *committed* crimes in the past may be relevant to establishing a propensity to commit crimes and, among other things, future dangerousness. The fact that a defendant was *convicted* of crimes in the past is relevant for an additional reason. A prior sentence indicates that being caught and punished previously was not sufficient to deter a defendant from committing another serious crime. This failure to be rehabilitated or deterred by a prior conviction generally weighs in favor of the imposition of a harsher sentence in a later case.

This distinction is recognized by the United States Sentencing Guidelines. Criminal conduct not resulting in a conviction does not affect the calculation of a defendant's Guideline range. *See* U.S.S.G. § 4A1.1. Moreover, in calculating a defendant's criminal history score, more points are assessed for past offenses that resulted

---

**20.** In its Notice of Intent to Seek the Death Penalty, the government alleges the Gregory carjacking as a single non-statutory aggrava-

ting factor. The five bank robberies are grouped together as one non-statutory aggravating factor that has five parts.

in lengthy sentences than for offenses for which a short sentence or probation was imposed. *Id.* The maximum possible sentence for a crime is not taken into account; only the sentence actually imposed determines the number of points assessed for a particular conviction. *Id.* Thus, a defendant's criminal history score, and therefore his criminal history category and Guideline range, is increased when prior sentences failed to achieve a deterrent effect.

Another concern implicated by including the bank robberies and carjacking as distinct non-statutory aggravating factors is the risk that jurors will improperly assign extra weight to aggravating factors because of sheer numerosity. The Tenth Circuit articulated a similar concern about duplicative aggravating factors in *United States v. McCullah,* 76 F.3d 1087, 1111–12 (10th Cir.1996), which involved several aggravating factors which necessarily included other factors. The court wrote:

> Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. *Cf. Stringer v. Black,* 503 U.S. 222, 230–32, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992). As the Supreme Court of Utah pointed out, when the same aggravating factor is counted twice, the "defendant is essentially condemned 'twice for the same culpable act,'" which is inherently unfair. *Parsons v. Barnes,* 871 P.2d 516, 529 (Utah) (quoting *Cook v. State,* 369 So.2d 1251, 1256 (Ala.1978)), *cert. denied,* 513 U.S. 966, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994). While the federal statute at issue is a weighing statute which allows the jury to accord as much or as little weight to any particular aggravating factor, the mere finding of an aggravating factor cannot but imply a qualitative value to that factor. *Cf. Engberg v. Meyer,* 820 P.2d 70, 89 (Wyo.

1991). When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot "assume it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer,* 503 U.S. at 232, 112 S.Ct. at 1137. In *Stringer* the Supreme Court made it clear that:

> When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.

*Id.* We hold that the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors.

*Id.*

The Supreme Court has expressed doubt as to whether duplicative aggravating factors may violate the Constitution. More specifically, it has stated that "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in *McCullah* and the Fifth Circuit appears to have followed here." *Jones,* 527 U.S. at 398, 119 S.Ct. 2090 (footnote omitted).

Nevertheless, this court must assure that any aggravating factor presented to the jury is relevant to its decision concerning whether Sampson should live or die. *Zant,* 462 U.S. at 878–79, 103 S.Ct. 2733; *Gregg,* 428 U.S. at 192, 96 S.Ct. 2909; *Gilbert,* 120 F.Supp.2d at 150–51. If a more general factor, such as future dangerousness, is proven, it may be improper for a jury to decide that Sampson deserves to die because he committed several bank robberies that were integral to its assessment of future dangerousness.

■ Next, Sampson argues that the aggravating factors " 'contemporaneous convictions for more than one murder' and the murder of Robert Whitney are alleged in a duplicative manner." Essentially, Sampson asserts that:

This combination of non-statutory aggravating factors is duplicative in that the government has taken a common core of factual circumstances and repeatedly realleged that core so that a set of common facts performs double-and triple-duty in the weighing process. Thus, the government will ask a jury to sentence Mr. Sampson to death for the murder of Mr. Rizzo because, *inter alia*, he also killed Mr. McCloskey. The government will then ask the jury to sentence Mr. Sampson to death for killing Mr. McCloskey because, *inter alia*, he also killed Mr. Rizzo. The circumstance of Mr. Whitney's murder then becomes a factor in the death sentencing equation for Mr. Rizzo's murder and, again, in the death sentencing equation for Mr. McCloskey's murder.

Def.'s Brief at 89. Although Sampson is correct that the jury might consider each of the three murders in two different contexts, he is incorrect when he asserts that this would be improper.

There are two counts in the indictment in this case. If there is a penalty phase, the jury will have to decide the appropriate sentence for each count of conviction. In determining the appropriate sentence for Count One, the jury will consider the charged crime, the McCloskey carjacking, as well as other relevant information about the defendant. The other two murders are relevant to determining the most ap-

propriate sentence for the McCloskey carjacking. Whether they are most appropriately presented to the jury as individual non-statutory factors or grouped as a single non-statutory factor, the additional murders could tend to justify a sentence of death for the McCloskey carjacking. In determining the appropriate sentence for Count Two, the Rizzo carjacking, the jury must perform a parallel analysis. "Double-counting occurs when one aggravating circumstance for a crime found by the jury necessarily subsumes another aggravator found by the jury for the same crime." *Hale v. Gibson*, 227 F.3d 1298, 1325 (10th Cir.2000). In this case, there are two crimes for which the defendant could receive the death penalty. There is no double-counting when the jury considers each aggravating factor once for each crime.

■ Sampson also argues that the court should strike the non-statutory, contemporaneous convictions for more than one murder factor because it closely resembles, but is not identical to, the statutory aggravating factor of multiple killings in a single criminal episode. *See* 18 U.S.C. § 3592(c)(16). Sampson asserts that "[t]he government should not be permitted to take a statutory aggravating factor, tinker slightly with its factual elements, and give it re-birth as a non-statutory factor..." Def.'s Brief at 90. This argument is without merit.

■ The government now acknowledges that the multiple murders did not result from a single criminal episode.[21] Therefore, there is not a risk that the jury will be considering duplicative factors relating to the multiple deaths. The fact

---

**21.** When the government obtained the Second Superseding Indictment, it contained a special finding alleging the statutory aggravating factor of multiple killings in a single criminal episode. However, when the government filed its Notice of Intent to Seek the Death Penalty,

it did not include this statutory aggravating factor and instead put the defendant on notice of its intent to prove the non-statutory aggravating factor at issue. *See also* June 11, 2003 Tr. at 131.

that the multiple murders do not constitute a statutory aggravating factor, however, does not preclude them from being presented as a non-statutory factor. One of the reasons for permitting the government to allege non-statutory aggravating factors is to provide the flexibility needed to ensure that the jury will be able to consider all information relevant to whether a death sentence is justified. No statutory list of aggravating factors could possibly encompass every consideration which is relevant to this decision. Consequently, the similarity between the alleged non-statutory aggravating factor and the statutory aggravating factor in 18 U.S.C. § 3592(c)(16) is of no consequence. The question the court must answer is whether the non-statutory aggravating factor is relevant to whether a death sentence is justified. In this case, it is.

 Sampson's final argument is that the non-statutory aggravating factor alleging "future dangerousness" is unconstitutionally vague and duplicative. This contention is not correct. *See Tuilaepa*, 512 U.S. at 973–74, 114 S.Ct. 2630 (discussing vagueness analysis).

More specifically, the government alleges that:

The defendant, Gary Lee Sampson, is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of prison officials and inmates as demonstrated by his history of prison misconduct including, but not limited to, escapes, attempted escapes, verbal threats to harm prison officials and inmates, and possession of dangerous weapons.

Notice of Intent to Seek the Death Penalty, at 8–9. In *Jurek*, 428 U.S. at 272–75, 96 S.Ct. 2950, the Supreme Court considered a challenge to the Texas death penalty scheme. The Texas statute asked "the jury to determine 'whether there is a prob-

ability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' if he were not sentenced to death." *Id.* at 272, 96 S.Ct. 2950 (quoting statutory question). The court wrote concerning this that:

Focusing on [this] question . . ., the petitioner argues that it is impossible to predict future behavior and that the question is so vague as to be meaningless. It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.

*Id.* at 274–75, 96 S.Ct. 2950.

In this case, the government properly seeks to focus the jury's inquiry on Sampson's future dangerousness in prison. If Sampson is convicted of either charge in this case and not sentenced to death, he will receive a life sentence. *See* U.S.S.G. § 2A1.1 A.N.1 ("The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for premeditated killing."); Def.'s Mot. to Withdraw Previously–Entered Please of Not Guilty and to Plead Guilty to Both Counts of the Indictment at 7–8. Consequently, any future dangerousness inquiry must be limited to considering Sampson's potential dangerousness in prison. *See, e.g., Llera Plaza*, 179 F.Supp.2d at 487–88. With this focus, there should be no risk that, as Sampson argues, a jury "might conclude that anyone willing to take a life even once is always potentially a future danger" and the factor will not serve a narrowing function. Def.'s Brief at 91.

"[L]ower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor in capital cases under the FDPA, including instances where such

factor is supported by evidence of low rehabilitative potential and lack of remorse." *Bin Laden,* 126 F.Supp.2d at 303–04. The court is not now deciding whether the government has sufficient reliable evidence to prove this factor or whether it is unfairly duplicative of any other factor. It is not, however, a factor that is unconstitutionally vague.

## XIII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendant Gary Lee Sampson's Motion to Dismiss this case (Docket No. 139) is DENIED.

2. Sampson's trial, which will be conducted consistent with the rulings in this Memorandum, shall commence on September 18, 2003.